# EXHIBIT A

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

THE 1929 PAPER COMPANY LLC,

MRS. JOHN L. STRONG & CO., LLC

AND

MRS. JOHN L. STRONG CO., INC.

DATED AS OF SEPTEMBER 3, 2009

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (including the Schedules hereto, as the same may be amended from time to time, this "Agreement"), is made and entered into as of this 3rd day of September, 2009 by and among Mrs. John L. Strong & Co., LLC, a Delaware limited liability company ("MJLS LLC"), Mrs. John L. Strong Co., Inc., a New York corporation ("MJLS Inc.", and collectively with MJLS LLC, the "Sellers"), and The 1929 Paper Company LLC, a Delaware limited liability company (the "Buyer").

## RECITALS

WHEREAS, MJLS LLC filed a Chapter 11 bankruptcy petition pursuant to Title 11 of the United States Code, 11 U.S.C. Section 101, et seq. in the United States Bankruptcy Court for the Southern District of New York at Bowling Green (the "LLC Bankruptcy Case"), which case was assigned case number 09-14820 (MG); and

WHEREAS, MJLS Inc. filed a Chapter 11 bankruptcy petition pursuant to Title 11 of the United States Code, 11 U.S.C. Section 101, et seq. in the United States Bankruptcy Court for the Southern District of New York at Bowling Green (the "Inc. Bankruptcy Case", and together with the LLC Bankruptcy Case, the "Bankruptcy Cases"), which case was assigned case number 09-15283; and

WHEREAS, the Buyer desires to purchase from the Sellers, and the Sellers desire to sell to the Buyer, certain assets of the Sellers free and clear of any Encumbrances (as defined below) except for Permitted Encumbrances (as defined below), inter alia, Sections 363 and 365 of the Bankruptcy Code (as defined below), pursuant to the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.

(a)    As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

"Acquired Assets" means those assets of the Sellers set forth on **Schedule 2.1**, whether owned individually or jointly with another Person, whether real or personal, tangible or intangible, wherever located, including all goodwill associated therewith, "as is where is".

"Acquired IP" means all Intellectual Property and Intellectual Property Rights (including the goodwill of the Sellers) owned by the Sellers as of the Closing (including the right to use the name "Mrs. John L. Strong" and other trade names included in the Acquired Assets and including the Intellectual Property listed on **Schedule 2.1**), and all right, title and interest of the Sellers in the Licensed Intellectual Property, if any.

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person. For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct the affairs of another Person by reason of ownership of voting stock, contract or otherwise.

"Assumed Contracts" means the Contracts listed on **Schedule 2.1(i)** as part of the Acquired Assets; provided, however, that from and after the date hereof until the Closing, the Buyer may, in its sole discretion, designate any Contract of the Sellers as an Assumed Contract or remove such Contract from **Schedule 2.1(i)** such that it is not an Assumed Contract, in each case by providing written notice of such designation or removal to the Sellers, in which case **Schedule 2.1(i)** shall be deemed to be amended to include or remove, as applicable, such Contract as an Assumed Contract (without the need for approval by any party pursuant to Section 10.1 hereof); provided, further however, that, subject to Section 2.5, any Contract which is terminated or rejected by the Sellers or the other party thereto, or terminates or expires by its terms, prior to the Closing (or prior to being assumed after the Closing pursuant to Section 2.6), or as to which a Consent or Governmental Authorization (other than of the Bankruptcy Court) is required to be obtained from any Person in order to permit the sale or transfer to the Buyer (or a Buyer Affiliate) of the Sellers' rights under such Contract and for which no such Consent or Governmental Authorization shall have been obtained, shall not be an Assumed Contract.

"Assumption Agreement" means the Assumption Agreement to be executed and delivered by the Buyer and the Sellers at the Closing, substantially in the form of Exhibit A.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. Section 101, et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York at Bowling Green or such other court having competent jurisdiction over the Bankruptcy Cases.

"Bidding Procedures Order" means the order of the Bankruptcy Court, in a form reasonably acceptable to the Buyer, which includes, among other things: (a) the Termination Fee and all other payments to the Buyer arising under this Agreement as obligations of the Sellers having super-priority, senior to all other administrative expense claims of the Sellers, as administrative expenses under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Cases, senior to all administrative expense claims of the Sellers' secured lenders, notwithstanding anything to the contrary in any Bankruptcy Court orders approving the Sellers use of cash collateral, paid, in cash, from the deposit and/or the sale proceeds generated by the sale or sales of the Acquired Assets upon and in connection with a Third-Party Sale and paid to the Buyer, in cash, prior to delivery of any sale proceeds to any of the secured lenders; (b) the

Buyer's designation as the stalking horse bidder together with the provisions of this Agreement to be performed by the Sellers before the Closing; (c) a deadline for the filing of objections to the entry of the Sale Order and the assumption by the Sellers and assignment to the Buyer (or a Buyer Affiliate) of Assumed Contracts; (d) a schedule for the Auction in accordance with the terms of this Agreement; (e) a schedule for the Sale Hearing in accordance with the terms of this Agreement; (f) implementation of the bidding procedures attached as Exhibit B; and (g) provisions implementing Sections 7.8 and 7.9.

"Bill of Sale" means the Bill of Sale and Assignment Agreement to be executed and delivered by the Sellers to the Buyer at the Closing, substantially in the form of Exhibit C.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed in New York, New York.

"Buyer's Representatives" means the Buyer's accountants, officers, employees, counsel, financial advisors and other authorized representatives.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means non-public, proprietary or confidential information that is labeled as such or should reasonably be understood by the recipient to be confidential, and includes trade secrets, research and development, methods of operations, analytical processes, software, source codes, inventions, databases, other technology, designs and other Intellectual Property, consulting techniques, processes, formulae, methods and methodologies for analyzing data, information concerning finances, investments, projections, profits, strategies, pricing, costs, products, services, service providers, vendors, customers' identities and needs, employees, partners, investors, personnel, compensation, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals, in whatever form or media, of the disclosing party and/or any third party that has disclosed or provided any of same to the disclosing party on a confidential basis; provided, that Confidential Information shall not include any information that is (i) lawfully in the public domain prior to its disclosure, or lawfully becomes publicly available other than through a breach of this Agreement or any other confidentiality obligation on behalf of any third party, (ii) disclosed to the recipient by a third party provided such third party, or any other party from whom such third party receives such information, is not in breach of any confidentiality obligation in respect of such information, (iii) developed by such recipient without use of Confidential Information, as evidenced by its business records or (iv) without obligation of confidentiality was rightfully known by the recipient prior to disclosure, as evidenced by its business records.

"Confidentiality Agreement" means that certain Confidentiality Agreement by and between MJLS LLC and SJ Lexington Associates LLC, dated May 15, 2009, as amended from time to time.

KL2 2606896.11

"Consent" means any approval, consent, ratification, permission, waiver or authorization, or an order of the Bankruptcy Court that deems, or renders unnecessary, the same.

"Contract" means any lease, contract, deed, mortgage, license or other legally enforceable agreement or instrument.

"Data" means all information and data (in any form or medium stored) concerning the Sellers and their business provided to, collected and organized by the Sellers or their Affiliates (or any third party), regardless of the source, including information and data concerning, provided by or related to customers of the Sellers, including (a) names, email addresses and mailing addresses, (b) information and data related to sales and transaction history, manner and frequency of access and contacts, and presence on and interactions with the business of the Sellers, including page view and browsing history, (c) information and data gathered by cookies, web beacon technology and web server logs, and other similar materials and (d) the database containing the data described in (a) through (c) (including, but not limited to the Software that stores, and enables the visibility, use and manipulation of such data).

"Encumbrances" means any charge, lien (statutory or otherwise), mortgage, lease, hypothecation, encumbrance, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, Claim, conditional or installment sale agreement, use or transfer limitation, equitable interest or similar restriction; *provided, however*, that Assumed Liabilities shall not constitute Encumbrances.

"Excluded License Agreement Payments" means all amounts owed by MJLS LLC to MJLS Inc. pursuant to the License Agreement.

"Final Order" means an order of the Bankruptcy Court as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, leasehold improvements, and other tangible personal property owned or used by the Sellers in the conduct of their respective businesses, including all such desks, chairs, tables, computer and computer-related hardware (including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks), copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies, but expressly excluding any Furniture and Equipment used by the Sellers under one or more equipment leases as identified in **Schedule 5.6(g)**.

"Governing Documents" means the charter, organizational and other documents by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs, and shall include: (a) in respect of a corporation, its certificate or articles of incorporation or association and/or its by-laws, (b) in respect of a partnership, its certificate of partnership and its partnership agreement, and (c) in respect of a limited liability company, its certificate of formation and operating or limited liability company agreement.

4

"Governmental Authority" means any federal, municipal, state, local or foreign governmental, administrative or regulatory authority, department, agency, commission or body (including any court or similar tribunal).

"Governmental Authorization" means any Permit, certificate, permission, clearance, designation or qualification issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"Intellectual Property" means (a) patents and patentable inventions, discoveries, innovations, improvements, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues (collectively, "Patents"), (b) registered and unregistered trademarks, service marks, brand names, domain names, certification marks, collective marks, logos, symbols, trade dress, trade names, assumed names, fictitious names, d/b/a's , and all other indicia of origin or quality, together with the goodwill associated therewith, and all applications, registrations and renewals thereof (collectively, "Trademarks"), (c) published and unpublished works of authorship, whether copyrightable or not, including databases and any other compilations of information and applications and registrations thereof, and all derivative works, renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"), (d) computer programs, software, firmware, middleware, user interface, URLs, web sites, source code, object code, databases and compilations, including any and all data and collections of data (including Website Data) whether machine readable or otherwise, algorithms, development tools, servers, and the like, flow charts, models and methodologies and other work product used to design, plan, organize and develop any of the foregoing, and user manuals and other training documentation related to any of the foregoing (collectively, "Software"), and (e) trade secrets, confidential information, show-how and knowhow, including processes, ideas, concepts, schematics, business methods and programs, formulae, drawings, prototypes, prototypes, models, designs, customer information, and lists, such as customer, manufacturer and supplier lists (collectively, "Trade Secrets"), and all Intellectual Property Rights arising from or in respect of each of the foregoing.

"Intellectual Property Rights" means all past, present, and future rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights and moral rights; (b) trademark and trade name rights and similar rights; (c) trade secret rights; (d) patents and industrial property rights; (e) other proprietary rights in Intellectual Property; and (f) rights in or relating to registrations, renewals, extensions, combinations, divisions, and reissues of, and applications for, any of the rights referred to in clauses "(a)" through "(e)" above.

"Inventory" means all inventory (including raw materials, products or work in-process, finished products, supplies and other inventories) of the Sellers, including those identified on **Schedule 2.1(d)**, wherever located.

"Knowledge" means, as to a particular matter, the actual knowledge (after reasonable due inquiry) of: (i) with respect to the Buyer, Lauren Marrus; and (ii) with respect to the Sellers, the Principals.

KL2 2606896.11

"Legal Requirement" means any federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, requirement, specification, determination, decision, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"Liability" means any debt, obligation or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation or liability would be required to be disclosed on a balance sheet prepared in accordance with generally accepted accounting principles and regardless of whether such debt, obligation or liability is immediately due and payable.

"License Agreement" means that certain License Agreement dated June 2, 2008 by and between MJLS Inc., as licensor, and MJLS LLC, as licensee.

"Licensed Intellectual Property" means all Intellectual Property and Intellectual Property Rights licensed to the Sellers pursuant to the Assumed Contracts, if any, including the License Agreement.

"Material Adverse Effect" means any event, condition, circumstance, development or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, has had or would reasonably be expected to have or to result in a material adverse effect on: (a) the Acquired Assets, taken as a whole; (b) the Assumed Liabilities, taken as a whole; or (c) the ability of the Sellers to perform their obligations under this Agreement.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the business of the Sellers consistent with past practice, including as to frequency and amount (it being understood that such ordinary and usual course takes into account the fact that the Sellers ceased conducting business, in substantially all respects, on or about May 15, 2009).

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Authority.

"Permitted Encumbrances" means: (a) statutory liens for current Taxes, special assessments or other governmental charges not yet due and payable; (b) mechanics', materialmens', carriers', workers', repairers' and similar statutory liens that involve an obligation that is not past due and that arose in the Ordinary Course of Business; and (c) statutory liens creating a security interest in favor of landlords under leases which do not interfere with the Sellers' current use of, or affect the value of, any Leased Property, but only to the extent that, with respect to each of clauses (a), (b) and (c) above, such Encumbrances do not or could not reasonably be expected to, individually or in the aggregate, materially detract from or impair the continued use and operation of the asset to which they relate.

6

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or government, political subdivision, agency or instrumentality of a Governmental Authority.

"Petition Dates" means the respective dates on which MJLS LLC and MJLS Inc. first filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

"Principal" means each of Nannette Brown, Jeffrey Lubin and Robert Daughton.

"Registered IP" means all Acquired IP that has been applied for or is registered, filed or issued under the authority of, with or by any Governmental Authority in the United States of America, including all Patents, Copyrights, registered mask works and registered Trademarks and all applications for any of the foregoing.

"Sale Hearing" means the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"Sale Motion" means one or more motions and notices filed by the Sellers and served on creditors and parties in interest, in accordance with the Bidding Procedures Order, other orders of the Bankruptcy Court, the Federal Rules of Bankruptcy Procedures and Local Rules, which motion(s) seeks authority from the Bankruptcy Court for the Sellers to enter into this Agreement and consummate the transaction contemplated by this Agreement.

"Sellers' Representatives" means the accountants, officers, employees, counsel, financial advisors and other authorized representatives of the Sellers.

"Tax" means any tax (including any income tax, franchise tax, service tax, capital gains tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, withholding tax or payroll tax), levy, assessment, tariff, duty (including any customs duty), deficiency or fee (including any fine, addition, penalty or interest), imposed, assessed or collected by or under the authority of any Governmental Authority or any Liability with respect to the foregoing by virtue of any Contract or otherwise.

"Tax Return" means any return, report, information return or other document (including any related or supporting information) required to be supplied to any Governmental Authority with respect to Taxes.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale, the Assignment Agreement and any other Contract to be entered into by the parties hereto in connection with the Closing.

"Transfer Taxes" means any sales, use, purchase, transfer, real property transfer, franchise, deed, fixed asset, stamp, documentary stamp or other Taxes and recording charges (including penalties and interest) payable in respect of (and as a result of) the sale of the Acquired Assets to, and the assumption of the Assumed Liabilities by, the Buyer (or a Buyer Affiliate).

KL2 2606896.11

"Website Data" means all information, data, code and other content necessary to create the look and feel of the websites www.mrsstrong.com, www.mrsjohnlstrong.com, www.mrsjlstrong.com and any other websites that relate or direct to the business historically conducted by the Sellers, including, but not limited to, product descriptions and information (including without limitation, SKUs, features, specifications and other information), product reviews, customer comments and reviews, photographs, images, ratings, graphic designs and clip art.

(b)     Each of the terms set forth below shall have the meaning ascribed thereto in the following Section:

| Definition | Location |
|---|---|
| Acquisition Transaction | Section 7.1(c)(iii) |
| Agreement | Preamble |
| Allocation Schedule | Section 3.2 |
| Assumed Liabilities | Section 2.3 |
| Auction | Section 7.8 |
| Bankruptcy Cases | Recitals |
| Business Confidential Information | Section 7.5(b) |
| Buyer | Preamble |
| Buyer Disclosure Schedules | ARTICLE VI |
| Closing | Section 4.1 |
| Closing Date | Section 4.1 |
| Contract Notice Period | Section 2.5(c) |
| Cure Payments | Section 2.5(e) |
| Deposit | Section 3.4 |
| Excluded Assets | Section 2.2 |
| Excluded Liabilities | Section 2.4 |
| Exclusive Information Users | Section 5.5(g) |
| Improvements | Section 5.6(c) |
| Inc. Bankruptcy Case | Recitals |
| Inconsistent Plan | Section 7.9(d) |
| IP Licenses | Section 5.5(d) |
| JLS Marks | Section 5.5(i) |
| Lease Documents | Section 5.6(b) |
| Leased Property | Section 5.6(a) |
| LLC Bankruptcy Case | Recitals |
| MJLS Inc. | Preamble |
| MJLS LLC | Preamble |
| Motions | Section 7.7(a) |
| Non-Exclusive Confidential Information | Section 7.5(c) |
| Personnel | Section 5.5(c) |
| Pre-Closing Period | Section 7.1(a) |
| Proceeding | Section 5.8 |
| Purchase Price | Section 3.1 |
| Sale Order | Section 7.7(a) |

8

| Definition | Location |
| --- | --- |
| Sellers | Preamble |
| Seller Confidential Information | Section 7.5(d) |
| Seller Disclosure Schedules | ARTICLE V |
| Termination Fee | Section 7.9 |
| Third-Party | Section 7.9(a) |
| Third-Party Sale | Section 7.9(a) |
| Walk-Through | Section 7.2(d) |

Section 1.2 <u>Construction</u>. The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. The term "including," when used herein without the qualifier, "without limitation," shall mean "including, without limitation." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require. The word "or" shall not be construed to be exclusive. Provisions shall apply, when appropriate, to successive events and transactions. The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Unless otherwise indicated, references to Articles, Sections, Schedules and Exhibits refer to Articles, Sections, Schedules and Exhibits of and to this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1 <u>Purchase and Sale of Acquired Assets</u>. On the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Sellers shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall purchase and acquire from the Sellers, all of the Sellers' right, title and interest in and to all of the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances); provided, <u>however</u>, that: (A) the Acquired Assets shall not include any Excluded Assets; and (B) from and after the date hereof until Closing, the Buyer may designate, in its sole discretion, any asset or assets that would otherwise be Acquired Assets as Excluded Assets by providing written notice of such designation to the Sellers, in which case **Schedule 2.2** shall be deemed to be amended accordingly (without the need for approval by any party pursuant to <u>Section 10.1</u> hereof).

Section 2.2 <u>Excluded Assets</u>. Notwithstanding any provision herein to the contrary, the Acquired Assets shall not include any of the assets identified on **Schedule 2.2** (collectively, the "<u>Excluded Assets</u>").

Section 2.3 <u>Assumed Liabilities</u>. On the Closing Date, the Buyer shall execute and deliver to the Sellers the Assumption Agreement pursuant to which the Buyer shall only assume and agree to pay, perform and discharge when due: (a) the obligations of the Sellers under the Assumed Contracts solely to the extent such obligations: (i) arise after the Closing; (ii) do not arise from or relate to any breach by the Sellers of any provision of any of such Assumed Contracts; (iii) do not arise from or relate to any event, circumstance or condition occurring or

existing on or prior to the Closing Date that, with notice or lapse of time, would constitute or result in a breach of any of such Assumed Contracts; and (iv) are ascertainable (in nature and amount) solely by reference to the express terms of such Assumed Contracts; and (b) Transfer Taxes and other Taxes payable by the Buyer pursuant to and to the extent provided in Section 3.3 (collectively, the "Assumed Liabilities"); provided that for the avoidance of doubt, the Assumed Liabilities shall expressly exclude any Excluded Liabilities. The Assumed Liabilities shall also include any obligations arising on or after the Closing Date from the Buyer actually taking custody and control of any customer dies (other than any liabilities arising as a result of actions or omissions to act caused by the Sellers prior to the Closing). At the Closing, the Sellers shall provide the Buyer with a list of the names of customers of the Sellers that have requested the return of their die(s) but for which such die(s) have not yet been returned by the Sellers prior to the Closing. The Sellers shall make reasonable efforts in preparing such list in ascertaining which customer(s) requested a return of their die(s).

Section 2.4    Excluded Liabilities. The Buyer shall not assume or be obligated to pay, perform or otherwise discharge any Liabilities of the Sellers or their Affiliates, whether incurred or accrued before or after the Petition Dates or the Closing, other than the Assumed Liabilities (all such Liabilities that the Buyer is not assuming being referred to collectively as the "Excluded Liabilities"). For the avoidance of doubt and notwithstanding anything contained in this Agreement to the contrary, the Excluded Liabilities shall include, without limitation: (a) all Taxes of the Sellers, including any sales tax due and owing to the State of New York for sales by the Sellers occurring prior to the Petition Date in the amount of approximately $7,700 (other than Transfer Taxes and other Taxes that are required to be paid by the Buyer pursuant to Section 3.3): (b) all Liabilities of the Sellers relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services performed in connection with this Agreement and any of the transactions contemplated hereby, and any pre-petition or post-petition Claims for such services; (c) all Liabilities of the Sellers under the Assumed Contracts to the extent such obligations arose: (i) prior the Closing (including any amounts due in respect of the Leased Property, including amounts due with respect to rent payments); (ii) from or relate to any breach by the Sellers of any provision of any of such Assumed Contracts; and (iii) from or relate to any event, circumstance or condition occurring or existing on or prior to the Closing Date that, with notice or lapse of time, would constitute or result in a breach of any of such Assumed Contracts; (d) all Liabilities with respect to current and former employees of the Sellers (including Liabilities under or relating to any of the Seller' employee benefit plans and any unpaid payroll Taxes); (e) all Liabilities relating to Excluded Assets and all Liabilities relating to the Cure Payments; (f) all Administrative Expenses; (g) all accounts payable (or other amounts payable) or other intercompany obligations of the Sellers owed by each other or their respective Affiliates; (h) any environmental Liabilities arising on or prior to the Closing Date under Environmental Laws; and (i) any other Liability that is not expressly included among the Assumed Liabilities.

Section 2.5    Assumption and Assignment of Certain Contracts. The Sale Order shall provide for the assumption by the Buyer, and the Sale Order shall, to the extent permitted by law, provide for the assignment by the Sellers to the Buyer and/or (in the Buyer's sole discretion) a Buyer Affiliate, effective upon the Closing, of the Assumed Contracts on the terms and conditions set forth in the remainder of this Section 2.5.

(a)     At the Closing, the Sellers shall assume and assign to the Buyer the Assumed Contracts.  The Sellers shall identify the Assumed Contracts by the effective date of the Assumed Contract (if available), the parties to the Assumed Contract and the address (if available) of any parties that are not the Sellers.  **Schedule 2.5(a)** sets forth the Sellers' good-faith estimate, as of the date hereof, of the amounts necessary to cure defaults, if any, with respect to each counterparty to any of the Assumed Contracts set forth on **Schedule 2.1(i)** as determined by the Sellers in a commercially reasonable manner based on the Sellers' books and records and good faith judgment.  The Sellers shall provide an update of such good faith estimate not less than three (3) Business Days prior to the Closing Date.

(b)     In the case of any amendment by the Buyer to **Schedule 2.1(i)**, the Sellers shall give notice to the other parties to any Contract to which such amendment relates of the removal or addition of such Contract from **Schedule 2.1(i)** within three (3) Business Days of the Buyer notifying the Sellers of such amendment or such lesser time as is approved by the Bankruptcy Court.

(c)     At any time, before or after Closing and prior to the liquidation and dissolution of the Sellers, subject to providing the Buyer with not less than five (5) Business Days prior written notice ("Contract Notice Period"), the Sellers may move to reject any Contract which is not an Assumed Contract; provided, however, the Buyer may, at any time during the Contract Notice Period, add such Contract to **Schedule 2.1(i)** and require the Sellers not to reject such Contract; provided that if the Buyer's rights under this Section 2.5(c) are exercised, the Buyer shall pay an additional sum to the Sellers, or at the election of the Buyer directly to the Third-Party to such Contract(s) added to **Schedule 2.1(i)** under this subsection, equal to the Cure Payment due under such Contract(s), as determined by order of the Bankruptcy Court or by agreement by and between the Sellers, the Buyer and the Third Party to the added Contract(s).  The Sellers shall (i) set forth on **Schedule 2.5(c)** the amount(s) it believes it owes as a Cure Payment on each Contract that is not reflected on **Schedule 2.1(i)** as an Assumed Contract as of August 28, 2009 and (ii) make reasonable efforts prior to the Closing to provide notice to the Third Parties to the Contracts not included on **Schedule 2.1(i)** of the amounts reflected on that schedule.

(d)     As part of the Motions (or, as necessary in one or more separate motions), the Sellers shall request that, by virtue of the Sellers providing notice of their intent to assume and assign any Contract, the Bankruptcy Court deem the non-debtor party to such Contract to have given any required Consent to the assumption of the Contract by the Sellers and assignment to the Buyer if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, the Sellers are authorized to assume and assign the Contract to the Buyer and the Buyer is authorized to accept such Assumed Contract pursuant to section 365 of the Bankruptcy Code.

(e)     Subject to Section 2.5(c), to the extent that any Assumed Contract is subject to a cure pursuant to section 365 of the Bankruptcy Code, the Sellers shall be responsible for such cure and to pay any amounts related to such cure obligations (the "Cure Payments").

KL2 2606896.11

(f)     The Sellers shall use their best efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to the Buyer and/or (in the Buyer's sole discretion) a Buyer Affiliate.  If the Sellers are unable to assign any such Assumed Contract to the Buyer pursuant to an order of the Bankruptcy Court, the Buyer and the Sellers shall, and shall cause their respective Affiliates to, use commercially reasonable efforts prior to the Closing to obtain, and to cooperate in obtaining, all Consents and Governmental Authorizations from Governmental Authorities and third parties necessary to assume and assign such Assumed Contract to the Buyer.

(g)     Notwithstanding anything contained in this Agreement to the contrary, with respect to the License Agreement, effective at the Closing: (i) each Seller agrees to unconditionally and irrevocably assign, transfer and convey to the Buyer and its successors and assigns, all of such Seller's right, title and interest in, to and under the License Agreement, including all of such Seller's rights and obligations thereunder (other than with respect to the obligation to pay, or the right to receive, the Excluded License Agreement Payments); and (ii) the Buyer agrees to accept and assume each such Seller's assignment of its entire right, title and interest in, to and under the License Agreement (other than with respect to the obligation to pay, or the right to receive, the Excluded License Agreement Payments).

Section 2.6     Post-Closing Assignment of Contracts.

(a)     With respect to any Contract which is not set forth on **Schedule 2.1(i)** as of the Closing, provided such Contract has not been rejected by the Sellers pursuant to section 365 of the Bankruptcy Code, following the Closing and until the dissolution and liquidation or reorganization of the Sellers, upon written notice(s) from the Buyer, the Sellers shall use commercially reasonably efforts to assume and assign to the Buyer, pursuant to section 365 of the Bankruptcy Code, as soon as practicable any Contract(s) set forth in the Buyer's notice(s); provided that, for the avoidance of doubt, the standard of commercial reasonableness shall be interpreted in light of the then current resources of the Sellers.

(b)     Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to the Buyer pursuant to this Section 2.6, such Contract shall be deemed an Assumed Contract and deemed scheduled on **Schedule 2.1(i)** for all purposes under this Agreement (without the need for approval by any party pursuant to Section 10.1 hereof).

Section 2.7     Assignment of Intellectual Property.  Effective at the Closing: (a) each Seller unconditionally and irrevocably agrees to assign to the Buyer and its successors and assigns all right, title and interest in, to and under the Intellectual Property of such Seller, together with the goodwill of the business associated with and symbolized by the Intellectual Property of such Seller, including, the right to petition, sue or otherwise seek and recover damages, profits and any other remedy (monetary, injunctive, declaratory or other), for any past, present or future infringement, dilution, conversion or misappropriation of, or other injury, offense, violation, breach of duty or wrong relating to, any of the Intellectual Property of such Seller, or any license, agreement, contract or other matter relating thereto (with the sole exception and exclusion of any and all rights to, claims, demands and causes of action for or in respect of the Excluded License Agreement Payments or other obligations of MJLS LLC under

12

the License Agreement that have accrued or otherwise existed prior to and/or as of the date hereof), and all rights, privileges and immunities under any treaty or convention relating to the Intellectual Property of such Seller, including the right to file foreign applications, registrations and license recordations in respect thereof; and (b) the Buyer agrees to accept and assume the foregoing assignment by such Seller of all right, title and interest in, to and under the Intellectual Property of such Seller.

## ARTICLE III
## PURCHASE PRICE AND DEPOSIT

Section 3.1    Purchase Price.  In consideration for the Acquired Assets, and subject to the terms and conditions of this Agreement, and the entry and effectiveness of the Sale Order, at the Closing, the Buyer shall assume the Assumed Liabilities by executing the Assumption Agreement and the Buyer shall pay to the Sellers an amount in cash equal to $350,000 (the "Purchase Price"), which shall be inclusive of the Deposit.  At the Closing, the Buyer shall pay and deliver the Purchase Price to the Sellers, by wire transfer of immediately available U.S. funds to an account designated by the Sellers at least three (3) Business Days prior to the Closing.

Section 3.2    Allocation of Purchase Price. Not less than five (5) Business Days prior to the Closing, the Buyer shall deliver to the Sellers a schedule (the "Allocation Schedule") allocating the Purchase Price (and any other items treated as consideration for United States federal income Tax purposes paid to the Sellers including the Assumed Liabilities) among the Acquired Assets and the covenants provided in Section 7.12.  The Allocation Schedule shall be reasonable and shall be prepared in accordance with Section 1060 of the Code and the regulations thereunder and any applicable provision of state, local or foreign law.  Each of the parties hereto agrees to (a) file Internal Revenue Service Form 8594, and all United States federal, state, local and non U.S. Tax Returns, in accordance with the Allocation Schedule and (b) provide the other promptly upon written request with any other information required to complete Internal Revenue Service Form 8594. The Sellers and the Buyer agree to file all Tax Returns in a manner consistent with the allocation described in this Section 3.2.

KL2 2606896.11

Section 3.3    Transfer Taxes.  Notwithstanding any other provision herein, any Transfer Taxes attributable to the sale of the Acquired Assets, as well as the cost of the filing of all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, shall be borne and paid equally by the Buyer, on the one hand, and the Sellers, on the other hand, when due, provided, however, that in no event shall the Sellers be responsible for any amounts due under this Section 3.3 in excess of one thousand ($1,000.00) dollars, and the Sellers and the Buyer shall file all necessary Tax Returns and other documentation required to be filed by them with respect to all such Transfer Taxes, and, if required by applicable law, the Buyer and the Sellers will, and will cause their Affiliates to, file or join in the execution of any such Tax Returns and other documentation; provided that the parties shall reasonably cooperate in availing themselves of any available exemptions from any collection of (or otherwise reduce) any such Transfer Taxes.  The Sellers shall prepare and file all necessary Tax Returns and other documentation relating to Transfer Taxes that they are required to file under applicable Legal Requirements and shall provide the Buyer with a reasonable opportunity to review and comment on such Tax Returns (and in any event not fewer than five (5) Business Days) prior to the filing thereof.

Section 3.4    Deposit.  Substantially contemporaneous with the Buyer's execution of this Agreement, the Buyer shall tender to Sellers, c/o the Sellers' counsel, Silverman Acampora LLP, the sum of twenty-five thousand ($25,000.00) dollars (the "Deposit"), in cash, by cashier's or certified check, as a good faith deposit of the Purchase Price, which Deposit shall be held in escrow by such firm pending release or deposit as provided below.  In the event that (i) the Buyer is determined not to be the highest or best offeror at the conclusion of the Auction, (ii) the Buyer is determined to be the highest or best offeror at the conclusion of the Auction but the same is not confirmed by the Bankruptcy Court or (iii) this Agreement is terminated pursuant to Section 9.1 (other than Section 9.1(b) hereof), the Sellers, through the Sellers' counsel, shall promptly return the Deposit to the Buyer.  If, however, the Buyer is determined to be the highest or best offeror at the conclusion of the Auction, and the same is confirmed by the Bankruptcy Court, the Sellers shall be permitted to deposit the Deposit into its Debtor-in-Possession account, with the amount of the Deposit thereafter to be credited against the Purchase Price, as adjusted as a result of the Auction in the event the Buyer has increased its Purchase Price offer during such Auction, at the Closing.  In the event of a termination of this Agreement pursuant to Section 9.1(b), the Sellers shall be permitted to keep the Deposit as liquidated damages and not as a penalty, which shall be the sole and exclusive remedy of the Sellers as a result thereof.

### ARTICLE IV
### THE CLOSING

Section 4.1    Time and Place of the Closing.   On the terms and subject to the satisfaction of the conditions contained in Article VIII of this Agreement, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "Closing") shall take place at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, at 10:00 A.M. (local time) no later than the second Business Day following the date on which the conditions set forth in Article VIII have been satisfied (other than the conditions with respect to actions the respective parties hereto will take at the Closing itself) or, to the extent permitted, waived by the applicable party in writing, or at such other place and time as the Buyer and the Sellers may mutually agree, but in

no event shall the Closing occur later than September 30, 2009, or such other date that is mutually agreeable in writing to the Buyer and the Sellers. The date and time at which the Closing actually occurs is herein referred to as the "Closing Date."

Section 4.2    Deliveries by the Seller.  At or prior to the Closing, the Sellers shall deliver the following to the Buyer:

(a)    a counterpart signature page to each Transaction Document to which the Sellers are a party, duly executed by the Sellers;

(b)    a copy of the Sale Order as entered by the Bankruptcy Court;

(c)    duly executed and acknowledged (as appropriate) assignments of the Registered IP included in the Acquired Assets, in a form reasonably acceptable to the Buyer and suitable for recording in the U.S. Patent and Trademark Office, as well as assignment documents for Acquired IP in other jurisdictions as reasonably requested by the Buyer;

(d)    such other documents or instruments of transfer or conveyance as the Buyer may reasonably require to transfer to the Buyer good and valid title, free and clear of all Encumbrances (other than Permitted Encumbrances), to all of the Acquired Assets in accordance with this Agreement, including as needed to convey to the Buyer the rights, title and interests as provided for in this Agreement to all the JLS Marks, the domain names (including evidence in writing that the registration for the domain names www.mrsstrong.com, www.mrsjohnlstrong.com and www.mrsjlstrong.com has been renewed by the Sellers), the Data and the Website Data (including website content), toll-free numbers and other miscellaneous domain names included in the Acquired Assets; and

(e)    all right, title and interest of the Sellers in, to and under the Acquired Assets, wherever located, with access thereto for all Acquired Assets in the custody and control of the Sellers as of the Closing, and, with regard to any of the Acquired Assets not within the custody and control as of the Closing, the Sellers will exercise reasonable efforts to assist the Buyer in obtaining custody and control of all such Acquired Assets.

Section 4.3    Deliveries by the Buyer.  At or prior to the Closing, the Buyer shall deliver the following to the Sellers:

(a)    the Purchase Price in accordance with Section 3.1;

(b)    certified copies of the resolutions duly adopted by the Buyer's board of directors authorizing the execution, delivery and performance of this Agreement and each of the other transactions contemplated hereby; and

(c)    a counterpart signature page to each Transaction Document to which the Buyer is a party, duly executed by the Buyer.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers have delivered to the Buyer and attached hereto certain Disclosure Schedules prepared by the Sellers with numbered sections corresponding to the relevant sections in this Article V (the "Seller Disclosure Schedules"), and any exception or qualification set forth in the Seller Disclosure Schedules with respect to a particular representation or warranty contained in this Article V shall be deemed to be an exception or qualification with respect to such section of this Article V and all other representations or warranties contained in this Article V only to the extent any description of fact regarding the event, item or matter is disclosed in such a way as to make it reasonably apparent from the face of such disclosure without further inquiry that such exception or qualification is applicable to such other Section of this Article V.

The Sellers hereby jointly and severally represent and warrant to the Buyer, as of the date of this Agreement and (unless the representation and warranty specifies that it is made as of the date of this Agreement) as of the Closing Date as follows:

Section 5.1    Organization.  The Sellers are duly formed, validly existing and in good standing under the laws of their respective jurisdiction of organization and have all requisite power and authority to own, lease and operate their respective properties and assets and to carry on their respective businesses as presently conducted.

Section 5.2    Authority; Execution and Delivery; Enforceability.

(a)    The Sellers have all requisite power and authority necessary to execute and deliver this Agreement and the other Transaction Documents to which they are a party and, upon entry and effectiveness of the Sale Order, will have all requisite power and authority necessary to consummate the transactions contemplated hereby and thereby.

(b)    The execution and delivery of this Agreement and the other Transaction Documents to which the Sellers are a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the board of directors (or other similar governing body) of the Sellers, and no other proceedings on the part of the Sellers are necessary to authorize this Agreement or the other Transaction Documents to which they are party or to consummate the transactions contemplated hereby or thereby.

(c)    This Agreement and the other Transaction Documents to which the Sellers are a party have been duly and validly executed and delivered by the Sellers, and assuming that this Agreement and the other Transaction Documents to which the Sellers are a party constitute valid and binding agreements of the Buyer to the extent that it is a party thereto, and subject to the entry and effectiveness of the Sale Order, constitute valid and binding agreements of the Sellers, enforceable against the Sellers in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

16

Section 5.3     No Conflicts; Consents.

(a)     The execution and delivery by the Sellers of this Agreement and the other Transaction Documents to which they are a party does not, and the consummation of the transactions and compliance by the Sellers with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Encumbrance upon any of the properties or assets of any Seller or any of or their respective subsidiaries under, any provision of (i) the Sellers' Governing Documents, (ii) subject to obtaining the third party consents set forth on **Schedule 5.3(a)** to the extent required, any Contract to which the Sellers are a party or by which any of their properties or assets are bound or (iii) any Legal Requirement applicable to the Sellers or their properties or assets.

(b)     No consent of, or registration, declaration or filing with, any Person or Governmental Authority is required to be obtained or made by or with respect to the Sellers or any of their respective subsidiaries in connection with the execution, delivery and performance of this Agreement and the other Transaction Documents to which the Sellers are a party or the consummation of the transactions contemplated hereunder or thereunder, other than (i) the entry of the Sale Order and (ii) such filings as may be required by the Bankruptcy Court in connection with the Bankruptcy Cases.

Section 5.4     Title to Assets.  The Sellers have good and valid title to, or, with respect to Leased Property and equipment leases, a valid leasehold interest in, the Acquired Assets, in each case free and clear of all Encumbrances (other than Permitted Encumbrances and other than Encumbrances which shall be terminated in the Bankruptcy Cases). Assuming entry of the Sale Order upon Closing, the Buyer will be vested with good and valid title to the Acquired Assets free and clear of all Encumbrances, excluding the Permitted Encumbrances, to the fullest extent permissible under Sections 363 and 365 of the Bankruptcy Code.  **Schedule 5.4** sets forth a correct and complete list of all Permitted Encumbrances on the Acquired Assets.  Except as set forth in **Schedule 5.4**, at the Closing all of the Acquired Assets will be located at the Leased Property.

Section 5.5     Intellectual Property

(a)     The Sellers are the sole and exclusive owners of, or have a valid license or otherwise has the right to use, without payment to any other Person, all of the Acquired IP, free and clear of any Encumbrances.  The consummation of the transactions contemplated hereunder does not and will not conflict with, alter or impair any rights of the Sellers in, to or under the Acquired IP or result in the payment of any additional amounts with respect thereto or require the consent of any other Person in respect thereof to permit the Sellers to own, use or hold for use any such Acquired IP. During the past three (3) years, the Sellers have not received any written communication from any Person asserting any ownership interest in any Acquired IP.

KL2 2606896.11

(b)     **Schedule 5.5(b)** identifies, as of the date hereof: (i) each item of Registered IP in which the Sellers have or purport to have an ownership interest of any nature (whether exclusively, jointly with another Person or otherwise); (ii) the jurisdiction in which such item of Registered IP has been registered or filed and the applicable registration or serial number; and (iii) any other Person that has an ownership interest in such item of Registered IP and the nature of such ownership interest.

(c)     The Acquired IP is valid, subsisting and enforceable.  The Acquired IP has been maintained in confidence in accordance with protection procedures customarily used in the industry to protect rights of like importance.  No former and current employee, agent, consultant and independent contractor who has contributed to or participated in the conception and development of any Acquired IP owned by the Sellers (collectively, "Personnel"), has any claim against the Sellers in connection with such Person's involvement in the conception and development of any Acquired IP that arises out of the relationship between such Personnel and the Sellers and, to the Knowledge of the Sellers, no such claim has been asserted or is threatened and there is no factual basis to support the likelihood of the existence of any such claim.  None of the current officers and employees of the Sellers have any Patents issued or applications pending for any device, process, design or invention of any kind now used or needed by the Sellers in the furtherance of its business, which Patents or applications have not been assigned to the Sellers with such assignment duly recorded in the United States Patent and Trademark Office.

(d)     **Schedule 5.5(d)** sets forth a complete and accurate list of each Contract pursuant to which: (i) the Sellers license any Acquired IP from any Person (other than licenses of non-customized software that are generally available to the public on standard terms); and (ii) any Person has been granted any license under, or otherwise has received or acquired any right (whether or not currently exercisable) or interest in, any Acquired IP (the "IP Licenses").  Except for the IP Licenses, there are no other Contracts (including licenses to a Seller by a Person, or by a Seller to a Person) involving any Acquired IP.  Each of the IP Licenses are valid and enforceable against the Sellers, and, to the Knowledge of the Sellers, the other party or parties thereto, in accordance with their terms.  The execution, delivery and performance of this Agreement and the Transactions Documents to which the Sellers are a party, and the consummation of the transaction contemplated hereby and thereby, will not, to the Knowledge of the Sellers, constitute a breach of the IP Licenses, nor cause the forfeiture or termination of any Acquired IP.

(e)     To the Knowledge of the Sellers, no Person has infringed, misappropriated or otherwise violated, and no Person is infringing, misappropriating or otherwise violating, any Acquired IP, except to the extent disclosed on **Schedule 5.5(e)**.  During the last three (3) years, to the Knowledge of the Sellers: (i) the Sellers, the Acquired IP and the Acquired Assets have not infringed (directly, contributorily, by inducement or otherwise) upon, conflicted with or violated any Intellectual Property Right of any other Person and (ii) the Sellers have not misappropriated or otherwise violated or infringed upon, any Intellectual Property Right of any other Person.

(f)     The Sellers have good and valid title to the following domain names free and clear of all Encumbrances: www.mrsstrong.com, www.mrsjohnlstrong.com and www.mrsjlstrong.com.

KL2 2606896.11

(g)     Other than as set forth on **Schedule 5.5(g)** ("Exclusive Information Users"), neither the Sellers nor any of their Affiliates has provided any Data or Website Data to any Person for any reason whatsoever outside the Ordinary Course of Business. The Sellers have provided the Buyer with copies of all Contracts, agreements and arrangements entered into with Exclusive Information Users regarding the provision of the information set forth in **Schedule 5.5**.

(h)     With respect to the Data and the Website Data, other than as set forth on **Schedule 5.5(h)**, (i) to the Knowledge of the Sellers, there has not been any security breach involving the Data or Website Data, (ii) the Sellers have not sold, licensed or otherwise provided a copy of or access to any Data or Website Data, in whole or in part, to any Person, except in the Ordinary Course of Business, and (iii) the Data and Website Data has been collected, stored, maintained and used in accordance with all applicable terms and policies of the Sellers and applicable Legal Requirements.

(i)     The Sellers own, and at the Closing the Buyer will own, all rights in and to the trademarks "Mrs. John L. Strong" and "Ready to Write" as well as the Trademarks listed on **Schedule 5.5(b)** (the "JLS Marks") and, to the extent not licensed, all other Trademarks used by the Sellers in association with the JLS Marks in the business conducted by the Sellers. To the Sellers' Knowledge, no third parties have any rights to use the JLS Marks and there is no jurisdiction in which the JLS Marks are not available for use and registration as a Trademark by the Sellers in connection with the operation of the business (and products or services similar thereto).

(j)     As of the date of this Agreement, the Data (i) contains no less than 10,000 deliverable, unique names and 2,500 corresponding email addresses of Persons who have opted into email promotion of the business of the Sellers; (ii) contains at least 5,000 names and corresponding, if applicable, email addresses of Persons who have purchased goods and/or services from the Sellers in the last five (5) years; and (iii) includes all historical transaction data within the possession or control of the Sellers or their Affiliates with respect any transaction conducted on or through any website owned by the Sellers.

Section 5.6     Leases.

(a)     **Schedule 5.6(a)** sets forth a complete list of all personal property and real property and interests in real property leased by the Sellers (individually, a "Leased Property"). The Sellers have good and valid title to the leasehold estates in all Leased Property, in each case free and clear of all Encumbrances (other that Permitted Encumbrances).

(b)     Current copies of the documents (including the Contracts that for the Leased Property, all amendments and modifications thereto) under which the Leased Properties are leased or operated (the "Lease Documents"), correct and complete in all respects, have been delivered or made available to the Buyer and there are no other Contracts between the Sellers with respect to the Leased Properties or otherwise relating to the use and occupancy of the Leased Properties thereby except for those documents listed on **Schedule 5.6(a)**.   Except as set forth in **Schedule 5.6(b)**, with respect to each Lease Document:

(i)      the Sellers and, to the Sellers' Knowledge, each other party named therein, has performed all of its obligations in all respects thereunder and is not in default (in the case of the Closing Date, other than late payments that are not past any applicable notice or cure periods) thereunder;

(ii)      to the Sellers' Knowledge, no defaults (in the case of the Closing Date, other than late payments that are not past any applicable notice or cure periods) (whether or not subsequently cured) exist thereunder, by or against either party with respect to the performance of its obligations, and, to the Sellers' Knowledge, no event has occurred or failed to occur or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease Document;

(iii)      such Lease Document is a valid and binding obligation of the Sellers, and to the Sellers' Knowledge, is a valid and binding obligation of each other party thereto, and is in full force and effect and is enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to or affecting creditors' rights generally, including the effect of statutory and other laws regarding fraudulent conveyances and preferential transfers and subject to the limitations imposed by general equitable principles (regardless whether such enforceability is considered in a proceeding at law or in equity);

(iv)      the transactions contemplated hereunder do not require the consent of any other Person to such Lease Document and will not result in a breach of or default under such Lease Document, or otherwise cause such Lease Document to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing;

(v)      neither the Sellers nor any of their respective Affiliates owes any brokerage commissions or finder's fees with respect to such Lease Document;

(vi)      no interest of the Sellers thereunder has been subleased, licensed, or assigned, and no Person has otherwise been granted the right to use or occupy the Leased Properties or any portion thereof;

(vii)      the interest of the Sellers thereunder has not been collaterally assigned thereby nor has any other security interest in such Lease Document or any interest therein been granted thereby;

(viii)      there are no disputes with respect thereto; and

(ix)      other than Permitted Encumbrances, there are no Encumbrances, Contracts, defects, claims or exceptions on or affecting the estate or interest created thereby or pursuant thereto.

KL2 2606896.11

(c)     The Sellers have no Knowledge (i) that all material buildings, structures, fixtures, building systems and equipment included in the Leased Property, including Furniture and Equipment (the "Improvements"), are not in good operating condition (normal wear and tear excepted), (ii) of any facts or conditions affecting any of the Improvements that would adversely interfere with the use or occupancy of the Improvements or any portion thereof in the operation of the business at the Leased Premises, (iii) that the property leased pursuant to each applicable Lease Document does not comply with all applicable subdivision, land parcelization and local governmental taxation or separate assessment requirements, without reliance on property not constituting Leased Property or (iv) that the Leased Properties are not connected to and serviced by water, sewage disposal, gas and electricity facilities which are adequate for the current use of any Leased Property and all material systems (including heating, air conditioning, electrical, plumbing and fire/life safety systems), all of which run through public rights of way or private easements for the current use of any Leased Property, are not operable and in any condition other than good condition ordinary wear and tear excepted.

(d)     The Sellers have no Knowledge of any zoning, building or similar laws, codes, ordinances, orders or regulations or conditions or agreements contained in any easement, restrictive covenant or any similar instrument or agreement affecting any Leased Property that are or will be violated by the continued maintenance, operation or use of any Improvements on the Leased Properties or by the continued maintenance, operation or use of the parking areas and the Sellers have not received written notice, asserting or implying to the contrary.

(e)     The Sellers have provided or made available to the Buyer true and complete copies of all building condition reports regarding the Leased Properties that are, to the Sellers' Knowledge, in the possession of the Sellers as of the date hereof, and the Sellers will promptly provide the Buyer with a true and complete copy of all such reports (if any) secured by the Sellers prior to Closing Date. Prior to the date hereof, the Sellers have delivered or made available to the Buyer complete, accurate and current copies of all title reports, deeds, mortgages, deeds of trust, surveys, licenses, title insurance policies, certificates of occupancy, or equivalent documentation with respect to the Leased Properties and other material documents relating to or materially affecting leasehold estates in the Leased Properties, in each case, to the extent the same are in the possession of the Sellers as of the date hereof.

(f)     The Sellers have not received notice of and to the Sellers' Knowledge, there is no condemnation, expropriation or other proceeding in eminent domain pending or threatened, affecting any of the Leased Property or any portion thereof or interest thereon.

(g)     **Schedule 5.6(g)** sets forth a correct and complete list of all Furniture and Equipment of the Sellers located on the Leased Property.

Section 5.7     Inventory.  **Schedule 5.7** sets forth a complete and correct list of all Inventory of the Sellers that have a value, individually or in the aggregate, in excess of $5,000, as of the date or dates reflected on such schedule. All Inventory (including Inventory ordered but not yet received) included as part of the Acquired Assets consists of items of a quality usable or saleable in the normal course of business consistent with past practices. Except as set forth in **Schedule 5.7**, at the Closing all Inventory will be located at the Leased Property, including any

21

Inventory that may be held or possessed by any Affiliate of the Sellers on or after the date hereof.

Section 5.8    Legal Proceedings and Orders. Other than in connection with the Bankruptcy Case, there is no action, suit, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) or investigation (each a "Proceeding") pending or being heard by or before, or otherwise involving, any Governmental Authority or any arbitrator or arbitration panel, and to the Sellers' Knowledge, no Person has threatened in writing to commence any Proceeding: (a) that relates to and would reasonably be expected to adversely affect any of the Acquired Assets; or (b) that challenges, or that would reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the transactions contemplated by this Agreement.  To the Knowledge of the Seller, and except as described on **Schedule 5.8**, there is no orders, writs, injunctions, judgments or decrees from any Governmental Authority to which the Seller or any of the Acquired Assets is subject

Section 5.9    Insurance. **Schedule 5.9** sets forth and correct and complete list of the insurance policies maintained with respect to the Sellers and their assets and properties. All such policies are in full force and effect, all premiums due and payable thereon have been paid (other than retroactive or retrospective premium adjustments that are not yet, but may be, required to be paid with respect to any period ending prior to the Closing Date), and no written notice of cancellation or termination has been received with respect to any such policy which has not been replaced on substantially similar terms prior to the date of such cancellation

Section 5.10    Brokers.  Other than as set forth on **Schedule 5.10**, no Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Sellers in connection with the transactions contemplated by this Agreement.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

Simultaneously with the execution and delivery of this Agreement, the Buyer has delivered to the Sellers certain Disclosure Schedules with numbered sections corresponding to the relevant sections in this Article VI (the "Buyer Disclosure Schedules"). The Buyer represents and warrants to the Sellers that, except as set forth in the Buyer Disclosure Schedules, as of the date of this Agreement and as of the Closing Date and as follows:

Section 6.1    Organization.  The Buyer is duly formed, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.

Section 6.2    Authority; Execution and Delivery; Enforceability.

(a)    The Buyer has all requisite power and authority necessary to execute and deliver this Agreement and the other Transaction Documents to which it is a party and, upon entry and effectiveness of the Sale Order, will have all requisite power and authority necessary to consummate the transactions contemplated hereby and thereby.

22

(b)     The execution and delivery of this Agreement and the other Transaction Documents to which the Buyer is party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the board of directors (or other similar governing body) of the Buyer, and no other proceedings on the part of the Buyer are necessary to authorize this Agreement or the other Transaction Documents to which it is party or to consummate the transactions contemplated hereby or thereby.

(c)     This Agreement and the other Transaction Documents to which the Buyer is a party have been duly and validly executed and delivered by the Buyer, and assuming that this Agreement and the other Transaction Documents to which it is party constitute valid and binding agreements of the Sellers to the extent that they are a party thereto, and subject to the entry and effectiveness of the Sale Order, constitute valid and binding agreements of the Buyer, enforceable against the Buyer in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

Section 6.3     No Conflicts; Consents.

(a)     The execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is a party does not, and the consummation of the transactions and compliance by the Buyer with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Encumbrance upon any of the properties or assets of the Buyer under, any provision of (i) the Buyer's Governing Documents, (ii) any Contract to which the Buyer is a party or by which any of its properties or assets are bound or (iii) any Legal Requirement applicable to the Buyer or its properties or assets.

(b)     No consent of, or registration, declaration or filing with, any Person or Governmental Authority is required to be obtained or made by or with respect to the Buyer or in connection with the execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party or the consummation of the transactions contemplated hereunder or thereunder, other than (i) the entry of the Sale Order and (ii) such filings as may be required by the Bankruptcy Court in connection with the Bankruptcy Cases.

Section 6.4     Legal Proceedings and Orders.     Other than in connection with the Bankruptcy Cases, there is no Proceeding pending or being heard by or before, or otherwise involving, any Governmental Authority or any arbitrator or arbitration panel, and to the Buyer's Knowledge, no Person has threatened in writing to commence any Proceeding that challenges, or that would reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the transactions contemplated by this Agreement.

Section 6.5     Brokers.     No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Buyer in connection with the transactions contemplated by this Agreement.

## ARTICLE VII
## COVENANTS OF THE PARTIES

Section 7.1      <u>Conduct of Business</u>.

(a)      Except as set forth in **Schedule 7.1** or as required by any order of the Bankruptcy Court (or as reasonably necessary in connection with the Bankruptcy Cases or the Auction) or applicable law or as contemplated or required by the terms of any Transaction Document or as otherwise consented to in writing by the Buyer, during the period commencing on the date of this Agreement and continuing through the Closing or the earlier termination of this Agreement in accordance with its terms (the "<u>Pre-Closing Period</u>"), the Sellers shall, and shall cause each of their Affiliates, to: (i) use reasonable best efforts to preserve (A) their businesses, the Acquired Assets (including the goodwill associated therewith) and their operations and (B) the goodwill and relationships with creditors, customers, clients, licensees, lessors, landlords, suppliers, employees and others having business dealings with the Sellers; and (ii) confer regularly with the Buyer, or at the Buyer's reasonable request, concerning operational matters and otherwise report regularly to the Buyer concerning the status of the Acquired Assets. In addition, and notwithstanding (and without limiting) anything to the contrary contained herein, following the Bankruptcy Court's entry of an order identifying the Buyer as the successful bidder and until the Closing or the earlier termination of this Agreement, the Sellers shall, and shall cause their Affiliates to, consult with the Buyer on all aspects of the Acquired Assets and decisions thereto and shall take into account the views of the Buyer with respect thereto.

(b)      Except as set forth in **Schedule 7.1** or as required by any order of the Bankruptcy Court or applicable law or as contemplated or required by the terms of any Transaction Document, during the Pre-Closing Period, the Sellers covenant that they will not, and that they will cause their Affiliates not to, without the prior written consent of the Buyer:

(i)      directly or indirectly (through any merger, consolidation, reorganization, issuance of securities or rights, license, lease, encumbrance or otherwise), sell, assign, convey, transfer, license, lease or otherwise dispose of or permit to become subject to an Encumbrance (other than Permitted Encumbrances or liens arising under any Bankruptcy Court orders relating to the use of cash collateral (as defined in the Bankruptcy Code)) any Acquired Assets (excluding the sale of Inventory to walk-in customers at the Leased Property located at 699 Madison Avenue, New York, NY based on unadvertised sales, <u>provided</u>, <u>however</u>, that a sign in the window of 699 Madison Avenue shall not be considered advertising, and so long as such Inventory consists solely of finished goods stored on the premises of such Leased Property (and not delivered from any storage or warehousing facility) and otherwise in the Ordinary Course of Business and in no event exceeding $25,000 in aggregate gross sales) or assets of the business or any interest therein amend in any adverse respect or voluntarily terminate (or waive any provision of) any Assumed Contract;

(ii)     directly or indirectly, abandon or cancel any proprietary or other Intellectual Property (whether registered or unregistered) of the Sellers (including the Acquired IP or any domain names) or the Data or take any action that could adversely affect the validity, enforceability or value of any such proprietary or other Intellectual Property or any part thereof;

(iii)    modify, amend, supplement, restate, terminate or permit the lapse of any lease or sublease of, or reciprocal easement agreement, operating agreement or other Contract relating to, the Leased Premises (except modifications or amendments associated with renewals of the Leased Premises in the Ordinary Course of Business);

(iv)    directly or indirectly, by way of action or omission, cease to maintain the Sellers' security controls and procedures in relation to the physical and electronic protection of the Data and Website Data, including but not limited to, unauthorized third party access thereto; or

(v)     authorize any of, or commit or agree to take, whether in writing or otherwise, to do any of, the foregoing actions, or request the Bankruptcy Court to approve or authorize the Sellers to take or omit to take any action which would breach the Sellers' covenants under or any other provisions of this Agreement, or consent to any such approval or authorization.

(c)     During the period commencing on the date of this Agreement and ending upon the filing of the Sale Motion, the Sellers covenant that they will not, and that they will ensure that their respective Seller's Representatives do not, directly or indirectly:

(i)     solicit, or knowingly encourage or knowingly facilitate the initiation or submission of, any expression of interest, inquiry, proposal or offer from any Person relating to a possible Acquisition Transaction (as defined below);

(ii)    participate in any discussions or negotiations or enter into any agreement with, or provide any nonpublic information to, any Person (other than the Buyer) relating to or in connection with a possible Acquisition Transaction; or

(iii)   entertain, consider or accept any proposal or offer from any Person (other than the Buyer) relating to a possible Acquisition Transaction. The term "Acquisition Transaction" means any transaction involving:

(A)    the sale, license, disposition or acquisition of all or a portion of the business or assets of any the Sellers (including any of the Acquired Assets);

(B)    the issuance, grant, disposition or acquisition of: (1) any capital stock or other equity security of the Sellers; (2) any option, call, warrant or right (whether or not immediately exercisable) to acquire any such capital stock or other equity security; or (3) any security, instrument or obligation that is or may become convertible into or exchangeable for any such capital stock or other equity security; or

(C) any merger, consolidation, business combination, tender offer, share exchange, recapitalization, reorganization or similar transaction involving the Sellers or any of their respective Affiliates.

(d) The Sellers shall use all commercially reasonable efforts to keep, or cause to be kept, all insurance policies set forth in **Schedule 5.9**, or suitable replacements therefor, in full force and effect (including payment of all premiums in respect thereof) through the close of business on the Closing Date.

Section 7.2 <u>Access to and Delivery of Information; Maintenance of Records</u>.

(a) During the Pre-Closing Period, the Sellers shall, during ordinary business hours, upon reasonable notice: (i) give the Buyer and the Buyer's Representatives reasonable access to the Sellers' accountants, counsel, financial advisors and other authorized outside representatives, officers and senior management and, upon reasonable request, other employees and all books, records and other documents and data, offices and other facilities of the Sellers to which the Buyer is not denied access by law; <u>provided</u> that, in connection with such access, the Buyer and the Buyer's Representatives shall use commercially reasonable efforts to minimize disruption to the business of the Sellers, the Bankruptcy Cases and the Auction; (ii) permit the Buyer and the Buyer's Representatives to make such reasonable inspections and copies of all books, records and other documents of the Sellers as the Buyer may reasonably request; and (iii) furnish the Buyer with such financial and operating data and other information as the Buyer and the Buyer's Representatives may from time to time reasonably request. Notwithstanding anything to the contrary set forth in this <u>Section 7.2(a)</u>, no access to, or examination of, any information or other investigation shall be permitted to the extent that it would require disclosure of information subject to attorney-client or other privilege; <u>provided</u> that the party asserting such privilege advises the other party of the specific assertion of such privilege. All information obtained by the Buyer or the Buyer's Representatives pursuant to this <u>Section 7.2</u> shall be subject to <u>Section 7.5</u>.

(b) Between the Closing Date and complete dissolution and liquidation of the Sellers, the Buyer and the Buyer's Representative shall have reasonable access to all of the Sellers' Inventory in its possession and control, and its books and records, including all information pertaining to the Acquired Assets and the Assumed Contracts, in the possession of the Sellers to the extent that: (i) such books, records and information relate to any period prior to the Closing Date; and (ii) such access may reasonably be required by the Buyer in connection with the Assumed Liabilities or the Excluded Liabilities, or other matters relating to or affected by the operation of the Sellers' business and the Acquired Assets. Such access shall be afforded by the Sellers upon receipt of reasonable advance notice and during normal business hours. If the Sellers shall desire to dispose of any such books and records upon or prior to its dissolution, the Sellers shall: (A) give the Buyer at least twenty (20) days prior written notice of such disposition; and (B) give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records as the Buyer may select and/or to copy such books and records as the Buyer may select.

(c)     Between the Closing Date and complete dissolution and liquidation of the Sellers, the Sellers and the Sellers' Representatives shall have reasonable access, at the sole cost and expense of Sellers, to all of the books and records of the Sellers delivered to the Buyer at Closing, including all information pertaining to the Assumed Contracts to the extent that: (i) such books, records and information relate to any period prior to the Closing Date; and (ii) such access may reasonably be required by the Sellers in connection with the Excluded Liabilities, the Excluded Assets or Tax matters relating to or affected by the operation of business of the Sellers. Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours. In connection with such access, the Sellers and Sellers' Representatives shall use commercially reasonable best efforts to minimize disruption to the Buyer's business; provided further that in connection with the Sellers' and/or the Sellers' Representatives' access to any offices and other facilities of the Buyer or any Affiliate of the Buyer, the Sellers and/or the Sellers' Representatives shall be accompanied at all times by a representative of the Buyer unless the Buyer otherwise agrees, shall not materially interfere with the use and operation of such offices and other facilities, and shall comply with all reasonable safety and security rules and regulations for such offices and other facilities. Following the Closing, all information obtained by the Sellers or the Sellers' Representatives pursuant to this Section 7.2 and all information included in the Acquired Assets shall be considered Confidential Information of the Buyer and subject to the provisions set forth in Section 7.5.

(d)     The Sellers shall provide the Buyer and the Buyer Representatives, at least one (1) Business Day prior to the Closing, with full and complete access to the Sellers' premises, during normal business hours, for the purpose of allowing the Buyer and the Buyer Representatives to examine and inspect the Acquired Assets to ensure that the Acquired Assets are of the same quality, quantify and condition as previously inspected by the Buyer on or about May 21, 2009 (the "Walk-Through").

Section 7.3    Expenses.   Except to the extent specifically provided herein, in the Bidding Procedures Order or in the Sale Order, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

KL2 2606896.11

Section 7.4    Further Assurances.    Subject to the terms and conditions of this Agreement and until the complete dissolution and liquidation or the consummation of a plan of reorganization of the Sellers or earlier termination of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Legal Requirements to consummate and make effective the sale of the Acquired Assets and assumption of the Assumed Liabilities in accordance with this Agreement.    The Sellers shall use all commercially reasonable efforts to cause the conditions set forth in Sections 8.1 and 8.2 to be satisfied on a timely basis.  The Buyer shall use all commercially reasonable efforts to cause the conditions set forth in Sections 8.1 and 8.3 to be satisfied on a timely basis.  Neither the Sellers, on the one hand, nor the Buyer, on the other hand, shall, without the prior written consent of the other, take any action which would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement.  From time to time, on or after the Closing Date until the dissolution and liquidation of the Sellers, the Sellers shall execute and deliver such documents to the Buyer as the Buyer may reasonably request in order to more effectively vest in the Buyer all of the Sellers' right, title and interest to the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).  Nothing in this Section 7.4 shall prohibit the Sellers from taking such actions as are necessary to conduct the Auction.  In the event that any Acquired Asset shall not have been conveyed to the Buyer at the Closing, the Sellers shall use commercially reasonable efforts to convey such Acquired Asset to the Buyer as promptly as is practicable after the Closing.

Section 7.5    Confidentiality.

(a)    The parties acknowledge and agree that the Confidentiality Agreement remains in full force and effect and that information exchanged between the parties or their Affiliates in connection with the transactions contemplated hereunder (as well as any information regarding the existence, status or termination of the transactions contemplated hereunder) is subject to the terms of and shall be treated in accordance with the Confidentiality Agreement.  If this Agreement is terminated prior to the Closing, the Confidentiality Agreement shall remain in full force and effect in accordance with its terms.  If the Closing occurs (a) the Confidentiality Agreement shall terminate effective as of the Closing and (b) the confidentiality provisions set forth in Sections 7.5(b), (c), (d) and (e) shall apply with respect to confidentiality obligations of the parties following the Closing.

(b)    If the Closing occurs, then Sellers shall, and shall cause their Affiliates to, keep strictly confidential (on terms no less restrictive than the Sellers' standards for protecting its own confidential information), and shall not use or disclose to any other Person (other than its Affiliates and the Sellers' Representatives), any Business Confidential Information, except as permitted by this Agreement, or as required by the Bankruptcy Code, the Bankruptcy Rules, and/or the Bankruptcy Court.  The Sellers shall only disclose Business Confidential Information (as defined below) to those Sellers' Representatives who are legally bound by a confidentiality obligation to the Sellers or their Affiliates no less protective of the Business Confidential Information than that contained in this Section 7.5 and who have a bona fide need to access the Business Confidential Information consistent with the Sellers' rights under this Agreement.  For purposes of this Agreement, "Business Confidential Information" means all Confidential Information that relates exclusively to the business of the Buyer and its Affiliates, the Acquired

KL2 2606896.11

Assets and the Assumed Liabilities, whether disclosed (i) prior to or after the Closing Date to the Buyer or (ii) after the Closing Date to the Sellers and/or their respective Affiliates pursuant to any post-Closing covenants provided under this Agreement.

(c)     The Sellers shall, and shall cause their Affiliates to, keep strictly confidential (on terms no less restrictive than the Sellers' standards for protecting their own confidential information), any Non-Exclusive Confidential Information (as defined below); provided, that nothing in this Agreement shall prevent or limit in any way whatsoever the right of the Sellers or their Affiliates to utilize or disclose the Non-Exclusive Confidential Information, without need to obtain consent therefor from the Buyer, or otherwise impose obligations on the Sellers or their Affiliates in respect of Non-Exclusive Confidential Information other than what the Sellers or their Affiliates would otherwise undertake for Seller Confidential Information. The term "Non-Exclusive Confidential Information" means any Confidential Information of the Sellers and/or their Affiliates that does not pertain exclusively, but otherwise relates, to the Sellers, the Acquired Assets or the Assumed Liabilities, whether disclosed prior to or after the Closing Date.

(d)     The Buyer shall, and shall cause its Affiliates to, keep strictly confidential (on terms no less restrictive than the Buyer's standards for protecting its own confidential information), and shall not use or disclose to any other Person (other than its Affiliates and its and the Buyer Representatives), any Seller Confidential Information (as defined below), except as permitted by this Agreement except as permitted by this Agreement, or as required by the Bankruptcy Code, the Bankruptcy Rules, and/or the Bankruptcy Court. The Buyer shall only disclose Seller Confidential Information to its or its Affiliates' or the Buyer Representatives who are legally bound by a confidentiality obligation to the Buyer or its Affiliates no less protective of the Seller Confidential Information than that contained in this Section 7.5(d) and who have a bona fide need to access the Seller Confidential Information consistent with Buyer's rights under this Agreement. The term "Seller Confidential Information" means all Confidential Information of the Sellers and/or their Affiliates other than (x) Business Confidential Information and/or (y) Non-Exclusive Confidential Information, in each case, whether disclosed prior to or after the Closing Date.

(e)     Notwithstanding anything to the contrary in this Section 7.5, any party may disclose Confidential Information: (i) if and to the extent such Confidential Information is required by subpoena or Order to be disclosed; (ii) to a Governmental Authority; (iii) pursuant to any Bankruptcy Proceeding; (iv) to the extent such disclosure is otherwise required by applicable Legal Requirements; (v) in connection with a party's exercise and enforcement of any rights or remedies provided under this Agreement; or (vi) to the extent such disclosure is required for financial or tax reporting purposes of the applicable party or its Affiliates; provided that if a Person is requested or required (by subpoena, court order or similar process) to disclose any Confidential Information as provided in Section 7.5(e)(i), or intends to disclose any Confidential Information as provided in Section 7.5(e)(ii) or (e)(iii), the Person from which the disclosure is sought or who intends to make such disclosure shall (A) provide the other parties with prompt written notice of such request or requirement and (B) make reasonable efforts to cooperate with the applicable party so that such party may seek a protective order or other appropriate remedy or protection.  If such protective order or other remedy or protection is not obtained, or the applicable party waives compliance with the provisions of this Agreement, the Person from

which the disclosure is sought shall use reasonable efforts to disclose only that portion of the Confidential Information that is legally requested or required to be disclosed.

Section 7.6    Public Statements; Cooperation.    In recognition of the importance of preserving the value of the Acquired Assets and enhancing the competitive position of the business conducted by the Sellers prior to the date hereof, except as otherwise required by the Bankruptcy Court:

(a)    prior to and after the Closing, the Sellers shall obtain the Buyer's prior written consent to any public announcement, public statement or other public disclosure made by or on behalf of any of the Sellers or any of the Sellers' Representatives with respect to this Agreement or the transactions contemplated hereby, except: (i) to the extent required by any Legal Requirement or order of the Bankruptcy Court; (ii) to facilitate the Auction; (iii) under the circumstances in which the Sellers are expressly permitted under Section 7.5 to make such disclosures; or (iv) as is consistent with any communications plan mutually agreed to by the Buyer and the Sellers; and

(b)    prior to the Closing, the Buyer shall obtain the Sellers' prior written consent (which consent shall not be unreasonably withheld or delayed) to any public announcement, public statement or other public disclosure made by or on behalf of the Buyer or any of the Buyer's Representatives with respect to this Agreement or the transactions contemplated hereby, except: (i) to the extent required by any Legal Requirement or order of the Bankruptcy Court; (ii) under the circumstances in which the Sellers are expressly permitted under Section 7.5 to make such disclosures; (iii) as is consistent with any communications plan mutually agreed to by the Buyer and the Sellers; or (iv) to the extent it has been determined that the Buyer will not be the purchaser of the Acquired Assets hereunder. For the avoidance of doubt, statements made by the Buyer to any customer, supplier, licensor, dealer or distributor of, or others having business relationships with, any of the Sellers with whom the Buyer has a pre-existing business relationship (in direct discussions with any such Person) shall not require the consent of the Sellers or be deemed to be a breach of this Section 7.6(b).

Notwithstanding the foregoing, the Buyer and the Sellers shall: (1) agree upon a pre-Closing communications plan, including plans for contacting Persons having business relationships with the Sellers (including suppliers, licensors, dealers, distributors and customers), and, in connection therewith, disclosing to such Persons the identity of the Buyer and the status and terms of this Agreement and the transactions contemplated hereby (and any such disclosure shall not be deemed a breach of Section 7.5); and (2) cooperate and coordinate with each other with respect to contacting any such Persons and developing and implementing any such plans.

Section 7.7    Submission for Bankruptcy Court Approval.

(a)    In no event later than August 28, 2009, the Sellers shall file a motion or motions (the "Motions") and supporting papers seeking: (i) the entry of the Bidding Procedures Order (including the scheduling of the Auction); (ii) the Bankruptcy Court's approval of this Agreement, each of the Sellers' performance under this Agreement and the assumption and the assignment of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code; and (iii) the entry of an order in the form of Exhibit D approving this Agreement, which order shall be a

Final Order in a form and substance reasonably acceptable to the Buyer and not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Sale Order"). The Buyer shall take such actions as are reasonably requested by the Sellers to assist the Sellers in obtaining a finding by the Bankruptcy Court that the Buyer is deemed to have purchased the Acquired Assets in good faith pursuant to section 363(m) of the Bankruptcy Code and that it has the necessary qualifications to show adequate assurance of future performance with respect to the Assumed Contracts as required by section 365 of the Bankruptcy Code. The Bidding Procedures Order and the Sale Order may, at the Sellers' option, be sought under one combined set of motion papers, which shall be in form and substance reasonably acceptable to the Buyer, provided, however, that the Seller shall not be required to obtain Buyer's acceptance prior to the filing of the Sale Motion. The Sellers shall use reasonable best efforts to have the Bankruptcy Court enter the Bidding Procedures Order within thirteen (13) Business Days following the filing of the motion therefor, to have the Sale Hearing no later than thirty (30) days after the date on which the Motions are filed and to have the Sale Order entered no later than thirty two (32) days after the date on which the Motions are filed. The Seller shall give notice under the Bankruptcy Code of the request for the relief specified in the Motions to any Person as to whom the Sellers have received notice that such Person has or may have, and to any Person who to the Sellers' Knowledge, might assert, a claim against or with respect to, or interest in, any of the Acquired Assets or Assumed Liabilities, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings relating to this Agreement or the transactions contemplated hereby. The Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to the Buyer at least two Business Days prior to their filing with the Bankruptcy Court for the Buyer's prior review and approval, which shall not be unreasonably withheld or delayed.

(b)     A list of the Assumed Contracts shall be filed as an exhibit to the Sale Motion, or, if required by the Bankruptcy Court, a motion to assume and assign the Assumed Contracts, and otherwise shall be described in sufficient detail to provide adequate notice to the non-debtor party to such Contracts. Upon revision of **Schedule 2.1(i)** by the Buyer, the Sellers shall add any Assumed Contracts to the exhibit or remove Assumed Contracts from the exhibit, as applicable.

(c)     The Sellers and the Buyer shall consult with one another regarding pleadings which any of them intends to file with, or positions any of them intends to take before, the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, the Bidding Procedures Order or the Sale Order. The Sellers shall promptly provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court (and other courts) that the Sellers have in their possession (or receive) pertaining to the motion for approval of the Bidding Procedures Order, the Sale Order or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the Bankruptcy Court's docket.

KL2 2606896.11

(d)     If the Bidding Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, Sale Order or other such order), subject to rights otherwise arising from this Agreement, the Sellers and the Buyer shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

Section 7.8     Overbid Procedures.  The Buyer and the Sellers acknowledge that the Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Sellers and other interested parties, providing information about the Sellers' business to prospective bidders (subject to confidentiality agreements no less restrictive than the those set forth in Section 7.5), entertaining higher or better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an auction (the "Auction").  The Sellers and the Buyer agree, and the motion to approve the Bidding Procedures Order shall reflect the fact that the provisions of this Agreement, including this Section 7.8 and Section 7.9, are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest and best price for the Acquired Assets.

Section 7.9     Termination Fee.  If:

(a)     (i) the Buyer is not identified as the successful bidder following completion of the actions contemplated by Section 7.7; (ii) at the time the successful bidder is identified, the Buyer is not in material breach of any material provision of this Agreement; (iii) the Buyer has not terminated this Agreement (other than pursuant to Sections 9.1(c) or 9.1(e)); and (iv) a sale of all or a material part of the Acquired Assets to a party or parties (collectively, a "Third-Party") other than the Buyer (the "Third-Party Sale") is consummated; or

(b)     (i) a Third-Party Sale is consummated (whether in the Chapter 11 Case or, if converted into a case under Chapter 7 of the Bankruptcy Code, such Chapter 7 case) within nine (9) months of the approval of the Bidding Procedures Order; (ii) at the time of the Third-Party Sale, the Buyer is not in material breach of any material provision of this Agreement; and (iii) the Buyer has not terminated this Agreement (other than pursuant to Sections 9.1(c) or 9.1(e)); or

(c)     the Sellers terminate this Agreement because the Buyer's bid is not the highest and best bid; or

(d)     the Sellers, or any individual Seller, files a Chapter 11 plan contemplating the sale or retention of a material portion of the Acquired Assets by such Seller in a manner substantially inconsistent with the terms of this Agreement (an "Inconsistent Plan"),

KL2 2606896.11

then the Buyer will be entitled to receive, without further order of the Bankruptcy Court, from the Sellers, or, in the event of a Third-Party Sale, out of the deposit from such Third-Party and the proceeds of the consummated sale, a "termination fee" of $25,000 (the "Termination Fee"), which shall include all of the Buyer's documented out-of-pocket expenses (including expenses of outside counsel, accountants and financial advisers) incurred since May 21, 2009 in connection with its evaluation, consideration and negotiation of a possible transaction with the Buyer and in connection with the transactions contemplated hereby. Such Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer to the Sellers or, in the event of a Third-Party Sale, from the Sellers, the deposit from such Third-Party and the proceeds of a Third-Party Sale, with such payment to be made on or before the first Business Day after the consummation of the Third-Party Sale or the effective date of an Inconsistent Plan, as applicable. In the event of a Third-Party Sale in which one or more of the secured lenders (or their agents or affiliates) of the Sellers is the acquiring party, if the cash proceeds from such sale and other funds of the Seller will be insufficient to pay the Termination Fee, such secured lender shall be required to pay any portion of the Termination Fee that cannot be paid in cash from the proceeds of such sale or such other funds to the Buyer (after taking into account the Carve-Out (as defined in the cash collateral order entered in the Bankruptcy Cases) as a condition precedent to the closing of such Third-Party Sale (it being understood that the remainder of the Termination Fee will be paid from the proceeds of such sale or other funds after taking into account the Carve-Out). The claim of the Buyer in respect of the Termination Fee shall constitute a super-priority administrative expense claim, senior to all other administrative expense claims of the Sellers, as administrative expenses under sections 503 and 507(b) of the Bankruptcy Code in each of the Bankruptcy Cases (but in no event greater than the total amount of the Termination Fee), senior to all administrative expense claims of the Sellers' secured lenders, notwithstanding anything to the contrary in any Bankruptcy Court orders approving the Sellers use of cash collateral, paid, in cash, from the deposit and/or the sale proceeds generated by the sale or sales of the Acquired Assets paid by a Third-Party Sale and paid to the Buyer, in cash, prior to delivery of any sale proceeds to any of the secured lenders. As part of any motion seeking entry of the Bidding Procedures Order, the Sellers shall seek approval by the Bankruptcy Court of this Section 7.9 (and that the substance of this Section 7.9 be in the Bid Procedures Order), which may be approved by the Bankruptcy Court separately from the remainder of this Agreement.

Section 7.10    Transfer of Acquired Assets.

(a)    The Sellers and the Buyer agree that unless otherwise requested by the Buyer in writing, any of the Acquired Assets that can be transmitted to the Buyer electronically (including the Data and the Website Data) will be so delivered to the Buyer at or promptly following (but in no event more than three (3) Business Days after) the Closing, in addition to being delivered in any tangible medium in which such Acquired Assets exist. Promptly following any electronic transmission, the Sellers shall execute and deliver to the Buyer a certificate in a form reasonably acceptable to the Buyer and containing, at a minimum, the following information: (i) the date of transmission; (ii) the time the transmission was commenced and concluded; (iii) the name of the individual who made the transmission; (iv) the signature of such individual; and (v) a general description of the nature of the items transmitted sufficient to distinguish the transmission from other transmissions.

KL2 2606896.11

(b)     The Buyer will make all necessary arrangements for the Buyer or an Affiliate of the Buyer to take possession of the Acquired Assets, and, at the Buyer's expense, to transfer same to a location operated by the Buyer or such Affiliate, at or as promptly as practicable following the Closing.  The Sellers shall exercise commercially reasonable best efforts to cooperate with the arrangements of the Buyer to take possession of the Acquired Assets without incurring anything other than *di minimis* expenses in doing so.

(c)     After the Closing, if the Sellers receive any payment, refund or other amount which is an Acquired Asset or which is otherwise properly due and owing to the Buyer, the Sellers shall promptly remit, or shall cause to be remitted, such amount to the Buyer. The Sellers shall promptly endorse and deliver to the Buyer any notes, checks, negotiable instruments or other documents which are Acquired Assets or otherwise properly due and owing to the Buyer, and the Buyer shall have the right and authority to endorse, without recourse, the name of the Sellers on any such instrument or document.

Section 7.11    <u>Post-Closing Operation of the Sellers; Name Changes</u>.

(a)     From and after the Closing, the Sellers will cease operations that are in any manner competitive with the business conducted by the Sellers in respect of the Acquired Assets being transferred to the Buyer hereunder.  Nothing contained herein shall preclude the Sellers from conducting any non-competitive business activities, selling Excluded Assets or enforcing its rights and performing its obligations under this Agreement and the other Transaction Documents; <u>provided</u> that except to the extent constituting part of the Acquired Assets, from and after the Closing, the Sellers shall cease all use of, and solely if requested by the Buyer, destroy all material (including signage displaying or referencing) containing the JLS Marks; <u>provided</u>, <u>however</u>, that the Buyer shall not be required to expend any funds (other than de minimus amounts) to comply with this provision.  Promptly, but in no event more than five (5) Business Days after the Closing, the Sellers shall, and shall cause their Affiliates to, take all necessary action to change their respective names, logos and d/b/a's to names, logos and d/b/a's bearing no resemblance to "Mrs. John L. Strong" or any variation thereof (or any of the Trademarks) and will file, and will cause its Affiliates using such name to file, such documents as are necessary to reflect such name change in each state in which the Sellers or their Affiliates is formed or organized and the other jurisdictions where the Sellers or their Affiliates are qualified to do business as a foreign entity and filing an application with and obtaining an order from the Bankruptcy Court requiring a change to the caption of all pleadings and documents to be filed in the Bankruptcy Cases from the names of the Sellers and the Sellers to names bearing no resemblance to "Mrs. John L. Strong" or any variation thereof.  For the avoidance of doubt, a name such as "Sturdy Stationary Liquidation Corp.", or a similar iteration, shall be deemed to be an acceptable replacement name to the Buyer, except that no use of "MJLS" shall be permitted. The Sellers agrees to promptly notify the Buyer of such name changes and the name chosen by the Sellers.  Notwithstanding the foregoing, the Sellers may refer to "Mrs. John L. Strong" and variations thereof as a former name for legal and noticing purposes in the Bankruptcy Cases and other legal documents.

KL2 2606896.11

(b)     The Sellers and each Principal agree not to, and to cause their Affiliates not to, make, participate in the making of, or knowingly encourage any Person to make any statement, whether written or oral, that disparages or defames the Buyer, its Affiliates, their businesses or the businesses conducted by the Sellers prior to the date hereof, including any clients or customers.

Section 7.12     Non Solicitation of Employees. Until the fifth anniversary of the Closing Date, the Sellers, on their own behalf and on behalf of their respective Affiliates, and agree not to, directly or indirectly, hire, offer to hire or solicit for employment any employee of the Buyer or its Affiliates, except that this Section 7.12 shall not prohibit the Sellers from (i) soliciting the public generally in any newspaper, trade journal or other publication, or any Internet website posting, (ii) participating in any third party hiring fair or similar event open to the public, (iii) seeking employees via a third party recruiting firm utilizing efforts not targeted at any of the employees of the Buyer or its subsidiaries or (iv) hiring any Person as a result solely of the actions described in clauses (i), (ii) and (iii).

## ARTICLE VIII
## CONDITIONS TO CLOSING

Section 8.1     Conditions to Each Party's Obligations to Effect the Closing.     The respective obligations of each party to effect the sale and purchase of the Acquired Assets shall be subject to the fulfillment at or prior to the Closing of the following conditions:

(a)     no preliminary or permanent injunction or other order or decree by any Governmental Authority which prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect and no Legal Requirement shall have been enacted by any Governmental Authority which prohibits the consummation of the transactions contemplated hereby; and

(b)     the Bankruptcy Court shall have entered the Sale Order substantially in the form of Exhibit D and such Sale Order shall (i) be a Final Order (except if modified or amended with the written consent of the Sellers and the Buyer or as agreed to on the record at any hearing before the Bankruptcy Court), provided, that it shall be a condition only to the obligations of the Buyer, and shall not be a condition to the obligations of the Sellers, that any order, including the Sale Order, be a Final Order; or (ii) contain an express waiver of any and all stays under Bankruptcy Rules 6004(h) and 6006(d), and a finding that the Buyer is a "good faith" purchaser under 11 U.S.C. §363(m).

Section 8.2     Conditions to Obligations of the Buyer. The obligation of the Buyer to effect the purchase of the Acquired Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following additional conditions:

(a)     the Sellers shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by it on or prior to the Closing Date;

(b)     the representations and warranties of the Sellers in this Agreement shall be true and correct as of the date hereof and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date), without regard to any materiality or "Material Adverse Effect" qualifiers contained in such representations and warranties, in each case except for failures of such representations and warranties to be true and correct that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect;

(c)     the Sellers shall have transferred to the Buyer or its designees all electronic data relating to the operation of the business of the Sellers (including Data and Website Data) located or stored on computer files of the Sellers or their Affiliates (such records to be provided in the format then maintained by the Sellers or their Affiliates; provided that the Buyer may request that the Sellers, at Buyer's cost and expense, convert such electronic data to a format reasonably requested by Buyer;

(d)     the Bankruptcy Court shall have entered the Bid Procedures Order, and such order shall not be stayed or modified;

(e)     the Sale Order shall be a Final Order entered by the Bankruptcy Court in form and substance acceptable to the Buyer in its sole discretion that provides, inter alia the following:

(i)     Specific findings of fact and conclusions of law:

(A)     the Buyer will not consummate the transactions contemplated by the Agreement unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of the Buyer or its Affiliates, or the Acquired Assets will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Encumbrances or Excluded Liability;

(B)     the Buyer is a good-faith purchaser of the Acquired Assets pursuant to Section 363(m) of the Bankruptcy Code;

(C)     the Sellers gave due and proper notice of this Agreement and the transactions contemplated hereby to all Persons entitled thereto;

(D)     the consideration to be paid by the Buyer under this Agreement constitutes reasonably equivalent value (as that term is defined in each of the Uniform Fraudulent Transfer Act and Section 548 of the Bankruptcy Code) and fair consideration for the Acquired Assets;

(E)     neither the Buyer nor the Sellers is entering into the transactions contemplated by this Agreement fraudulently;

(F)     the Sellers have provided adequate assurances to all parties to the Assumed Contracts which are to be assigned on any Closing Date (provided that the Buyer has submitted to the Seller and the Court information sufficient to establish such adequate assurance);

(H)     all defaults under the Assumed Contracts which are to be assigned on any Closing Date are deemed cured;

(I)     as of the Closing Date, (1) the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Acquired Assets to the Buyer and shall vest the Buyer with title to such assets free and clear of all Encumbrances and Excluded Liabilities, and (2) this Agreement and the transactions and instruments contemplated hereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Seller or any chapter 11 trustee of the Seller and their applicable estate; and

(J)     neither the Buyer nor the Sellers have engaged in any conduct that would cause or permit the transaction to be avoided under Bankruptcy Code section 363(n).

(ii)     Specific Orders of the Bankruptcy Court:

(A)     approving this Agreement and all of the terms and conditions hereof in all respects, and approving and authorizing the Sellers to consummate the transactions contemplated by this Agreement, including the sale of the Acquired Assets free and clear of all Encumbrances and Excluded Liabilities;

(B)     ordering that none of the Buyer or its Affiliates, members or shareholders or the Acquired Assets will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Encumbrance or Excluded Liability;

(C)     retaining core jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2) (2005), over resolution of any controversy or claim arising out of or relating to this Agreement, or the breach hereof;

(D)     extending, as and to the extent necessary the time period under Section 365 of the Bankruptcy Code by which the Seller must assume (or assume and assign) or reject any Contract to at least the last date under which the Buyer shall have the option to include such Contract in the Acquired Assets;

(E)     ordering that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry;

KL2 2606896.11

(F)  approving the Sellers' assumption of all Assumed Contracts which are to be assigned on the Closing Date pursuant to Section 365 of the Bankruptcy Code, and their assignment to the Buyer or its designee, as the case may be;

(G)  approving and authorizing the Sellers to take all other and further actions necessary to implement the transactions contemplated by this Agreement; and

(H)  enjoining and forever barring the non-Sellers party or parties to each Assumed Contract which is to be assigned on the Closing Date from asserting claims against the Buyer, any of its Affiliates or any of the Acquired Assets based on facts and circumstances arising prior to the Closing;

provided, however, that express inclusion in the Sale Order issued and entered by the Bankruptcy Court of the provisions required under (e)(i)(B) and (e)(ii)(E) of this subsection shall be a deemed waiver by the Buyer of the Final Order requirement to Closing so long as such Sale Order also contains the balance of the provisions required by this subdivision.

(f)  all consents and approval required to be obtained by the Sellers that are not eliminated by the Sale Order shall have been obtained and in full force and effect as of the Closing and without imposing any obligations, financial or otherwise, on the Buyer;

(g)  the Acquired Assets shall be able to be delivered free and clear of any Encumbrances other than Permitted Encumbrances;

(h)  the Buyer shall have received the other items to be delivered to it pursuant to Section 4.2;

(i)  since the date of this Agreement, there shall have not have occurred any Material Adverse Effect, and no events, developments or effects shall have occurred (and no circumstances or conditions shall have come into existence) since the date of this Agreement that would reasonably be expected to have or result in a Material Adverse Effect;

(j)  the Buyer shall be reasonably satisfied with the Walk-Through; and

(k)  the Contracts for the Leased Property identified in **Schedule 2.1(i)** remain in the bankruptcy estate of the Sellers and no motion has been granted by the Bankruptcy Court that would impact the same or cause any such Contract not to be part of the bankruptcy estate of the Sellers.

Any condition specified in this Section 8.2 may be waived by the Buyer; provided that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer.

KL2 2606896.11

Section 8.3 <u>Conditions to Obligations of the Sellers</u>. The obligation of the Sellers to effect the sale of the Acquired Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following additional conditions:

(a) the Buyer shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by it on or prior to the Closing Date;

(b) the representations and warranties of Buyer in this Agreement shall be true and correct as of the date hereof and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date), without regard to any materiality qualifiers contained in such representations and warranties, in each case except for failures of such representations and warranties to be true and correct that, individually or in the aggregate, have not had and would not reasonably be expected to have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement; and

(c) the Sellers shall have received the other items to be delivered to it pursuant to <u>Section 4.3</u>.

Any condition specified in this <u>Section 8.3</u> may be waived by the Sellers; <u>provided</u> that no such waiver shall be effective against the Sellers unless it is set forth in a writing executed by the Sellers.

**ARTICLE IX**
**TERMINATION AND ABANDONMENT**

Section 9.1 <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing by:

(a) mutual written consent of the Sellers and the Buyer;

(b) the Sellers if: (i) any of the Buyer's representations and warranties contained in this Agreement shall be inaccurate, in any material respect, as of the date of this Agreement, or shall have become inaccurate, in any material respect, as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date), such that the condition set forth in <u>Section 8.3(b)</u> would not be satisfied; or (ii) any of the Buyer's covenants or obligations contained in this Agreement shall have been breached, in any material respect, such that the condition set forth in <u>Section 8.3(a)</u> would not be satisfied; <u>provided</u>, <u>however</u>, that the Sellers shall not have a right to terminate this Agreement under this <u>Section 9.1(b)</u> if the Sellers are then in breach of this Agreement; <u>provided</u>, <u>further</u>, that if an inaccuracy in any of the Buyer's representations and warranties or a breach of a covenant or obligation by the Buyer is curable by the Buyer within ten (10) Business Days after the date of written notice from the Sellers to the Buyer of the occurrence of such inaccuracy or breach, then the Sellers may not terminate this Agreement under this <u>Section 9.1(b)</u> on account of such inaccuracy or breach: (A) during the ten (10) Business Day period commencing on the date on which the Buyer receives notice of such inaccuracy or breach; or (B) after such ten (10) Business Day period if such

inaccuracy or breach shall have been fully cured during such period in a manner that does not result in a material breach of any covenant or obligation of the Buyer;

(c)     the Buyer if: (i) any of the Sellers' representations and warranties contained in this Agreement shall be inaccurate, in any material respect, as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date), such that the condition set forth in Section 8.2(b) would not be satisfied; or (ii) any of the Sellers' covenants or obligations contained in this Agreement shall have been breached, in any material respect, such that the condition set forth in Section 8.2(a) would not be satisfied; provided, however, that the Buyer shall not have a right to terminate this Agreement under this Section 9.1(c) if the Buyer is then in breach of this Agreement; provided, further, that if an inaccuracy in any of the Sellers' representations and warranties or a breach of a covenant or obligation by any of the Sellers is curable by it within ten (10) Business Days after the date of written notice from the Buyer to the Sellers of the occurrence of such inaccuracy or breach, then the Buyer may not terminate this Agreement under this Section 9.1(c) on account of such inaccuracy or breach: (A) during the ten (10) Business Day period commencing on the date on which the Sellers receive notice of such inaccuracy or breach; or (B) after such ten (10) Business Day period if such inaccuracy or breach shall have been fully cured during such period in a manner that does not result in a material breach of any covenant or obligation of the Sellers;

(d)     by either the Sellers or the Buyer, if any Legal Requirement or injunction shall have become final and nonappealable is in effect preventing the consummation of the transactions contemplated hereunder; provided that the party seeking to terminate pursuant to this Section 9.1(d) shall have used its reasonable best efforts to challenge such Legal Requirement, order, decree or judgment;

(e)     the Buyer or the Sellers, if the Bankruptcy Court enters an order approving a Third-Party Sale or if one or both of the Bankruptcy Cases is dismissed or converted to Chapter 7 of the Bankruptcy Code for any reason;

(f)     the Buyer, at any time on or after October 5, 2009, if the Sale Order has not been entered by the Bankruptcy Court such date on the docket of the Bankruptcy Court; provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 9.1(f) if the breach by the Buyer, in any material respect, of any representation, warranty or covenant contained in this Agreement is a proximate cause of the failure of the Sale Order to be entered by such date; or

(g)     the Sellers, on or after October 5, 2009, if the Sale Order has not been entered by the Bankruptcy Court by such date on the docket of the Bankruptcy Court; provided, that the Sellers shall not be entitled to terminate this Agreement pursuant to this Section 9.1(g) if their own breach by the Sellers, in any material respect, of any representation, warranty or covenant contained in this Agreement is a proximate cause of the failure of the Sale Order to be entered by such date; or

(h)    the Buyer, if the Closing shall not have occurred on or prior to the date ten (10) Business Days following the date the Sale Order is entered by the Bankruptcy Court, or the Sellers, if the Closing shall not have occurred on or prior to the date ten (10) Business Days following the date the Sale Order is entered by the Bankruptcy Court; provided, that the Buyer or the Sellers, as the case may be, shall not be entitled to terminate this Agreement pursuant to this Section 9.1(h) if its own breach of any representation, warranty or covenant contained in this Agreement is a proximate cause of the failure of the Closing to occur on or prior to such date.

Section 9.2    Procedure and Effect of Termination.    In the event of termination of this Agreement and abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto provided, however, that: (a) no party shall be relieved of any Liability arising from any intentional breach by such party of any provision of this Agreement; and (b) Section 7.9 and Article X shall not be affected by the termination hereof.

Section 9.3    Extension; Waiver.    At any time prior to the Closing, the Sellers, on the one hand, or the Buyer, on the other hand, may: (a) extend the time for the performance of any of the obligations or acts of the Buyer (in the case of an agreed extension by the Sellers) or the Sellers (in the case of an agreed extension by the Buyer); (b) waive any inaccuracies in the representations and warranties of the Buyer (in the case of a wavier by the Sellers) or the Sellers (in the case of a waiver by the Buyer) contained herein or in any document delivered pursuant hereto; (c) waive compliance with any of the agreements of the Buyer (in the case of a wavier by the Sellers) or the Sellers (in the case of a waiver by the Buyer) contained herein; or (d) waive any condition to its obligations hereunder.   Any agreement on the part of the Sellers, on the one hand, or the Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of the Sellers or the Buyer, as applicable.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

Section 10.1    Amendment and Modification.    This Agreement may be amended, modified or supplemented only by written agreement of the Sellers and the Buyer.

Section 10.2    Waiver of Compliance; Consents.    Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant or condition herein may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed by the party or parties granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, or condition shall not operate as a waiver of, or estoppel with respect to any subsequent or other failure.

Section 10.3    Survival.    The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties nor any of their respective officers, directors, representatives, employees, advisors or agents shall have any Liability to the other after the Closing for any breach thereof (it being understood that nothing in this Section 10.3 shall impact any remedy available to any party hereto in the event of fraud).    The parties hereto agree that only the covenants contained in this Agreement to be

performed at or after the Closing Date shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing Date for any breach thereof.

Section 10.4 <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express), two (2) Business Days after delivery to such courier; (c) if sent by facsimile transmission before 5:00 p.m. in New York, when transmitted and receipt is confirmed; (d) if sent by facsimile or email transmission and receipt is confirmed, on the following Business Day; and (e) if otherwise actually personally delivered, when delivered, provided that such notices, requests, demands and other communications are delivered to the address set forth below, or to such other address as any party shall provide by like notice to the other parties to this Agreement:

(a) If to the Sellers, to:

Mrs. John L. Strong & Co., LLC (prior to the Closing)
699 Madison Avenue, 5th Floor
New York, NY 10065
Attn: Bob Daughton

P.O Box 44 (after the Closing)
Sagaponack, NY 11962-0000
Attention: Nannette Brown

with a copy to:

Robert Nosek, Esq.
Silverman Acampora LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Telephone: 516.479.6300
Facsimile: 516.945.6307
Email: RNosek@SilvermanAcampora.com.

(b) If to the Buyer, to:

The 1929 Paper Company LLC
1049 Lexington Avenue
New York, New York 10021
Telephone: 212.570.4800
Facimile: 212.570.4801
Email: lauren@dempseyandcarroll.com
Attention: Lauren Marrus

with a copy to:

Thomas Janover, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212.715.9186
Facsimile: 212.715.8000
Email: tjanover@kramerlevin.com

Section 10.5    Assignment.    This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, including, in the case of the Sellers, the Sellers' trustee in the Bankruptcy Cases; provided, however, that: (a) prior to the Closing Date, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law, without the prior written consent of the other parties hereto; and (b) that this Agreement shall be assignable by the Buyer, without the prior written consent of the Sellers, only to one or more Affiliates of the Buyer, so long as the Buyer shall continue to remain obligated hereunder.   Any assignment of this Agreement or any of the rights, interests or obligations hereunder in contravention of this Section 10.5 shall be null and void and shall not bind or be recognized by the Sellers or the Buyer.

Section 10.6    No Third Party Beneficiaries.    This Agreement is for the sole benefit of the parties hereto and their successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the parties hereto and such successors and permitted assigns, any legal or equitable rights hereunder.

Section 10.7    Severability.    If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 10.8    Governing Law.    This Agreement and any disputes arising hereunder or related to the transactions contemplated hereby shall be governed by and construed in accordance with the Bankruptcy Code and the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

KL2 2606896.11

Section 10.9   Waiver of Jury Trial.  Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated hereunder.  Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement, as applicable, by, among other things, the mutual waivers and certifications in this Section 10.9.

Section 10.11   Entire Agreement.   This Agreement and the Transaction Documents, along with the Schedules and Exhibits thereto, contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings relating to such subject matter (written or oral).  None of the parties shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein.

Section 10.13   Submission to Jurisdiction.  Unless and to the extent otherwise specifically provided herein, the parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby.  Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute or proceeding brought in such courts or any defense of inconvenient forum in connection therewith.

Section 10.14   Counterparts.  This Agreement may be executed and delivered (including by facsimile or PDF transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which, when executed and delivered, shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

Section 10.15   Incorporation of Schedules and Exhibits.   All Schedules and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 10.16   Entire Agreement.   This Agreement (including all Schedules and all Exhibits) and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto.

Section 10.17   Remedies.  Except as otherwise expressly provided in this Agreement, any and all remedies expressly conferred upon a party to this Agreement shall be cumulative with, and not exclusive of, any other remedy contained in this Agreement, at law or in equity and the exercise by a party to this Agreement of any one remedy shall not preclude the exercise by it of any other remedy.  In addition, the parties agree that irreparable damage would occur in the event that the parties fail to perform their obligations in accordance with the terms of this Agreement

KL2 2606896.11

and each party shall be entitled to specific performance in such event, in addition to any other remedy at law or in equity.

Section 10.18 <u>Bulk Sales or Transfer Laws</u>. The Buyer hereby waives compliance by the Sellers with the provisions of the bulk sales or transfer laws of all applicable jurisdictions. The Sellers agree to cooperate with the Buyer, upon the reasonable request of the Buyer and at the Buyer's expense, in making any bulk sales filings the Buyer may, in its sole discretion, decide to file.

Section 10.19 <u>Expenses</u>. Except as otherwise provided in this Agreement, each of the Buyer and the Sellers shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 10.20 <u>Injunctive Relief</u>. Damages at law may be an inadequate remedy for the breach of <u>Section 7.1</u> or <u>Section 7.5</u> of this Agreement and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of the covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained therein. The rights set forth in this <u>Section 10.20</u> shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement

Section 10.21 <u>Headings</u>. The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

\* \* \* \* \*

KL2 2606896.11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**THE 1929 PAPER COMPANY LLC**

By: _s/Lauren Marrus_
Name: Lauren Marrus
Title: President and CEO

**MRS. JOHN L. STRONG & CO., LLC**

By: _s/Bob Daughton_
Name: Bob Daughton
Title: CFO

**MRS. JOHN L. STRONG CO., INC.**

By: _s/Nannette Brown_
Name: Nannette Brown
Title: CEO

## Schedule 2.1

## Acquired Assets

(a)    All Intellectual Property, including all general intangibles and associated Intellectual Property of the Sellers or their Affiliates relating to the business of the Sellers, including all right, title and interest in, to and under any websites and Internet domain names of the Sellers and their Affiliates relating thereto (including but not limited to www.mrsstrong.com, www.mrsjohnlstrong.com and www.mrsjlstrong.com), all Data, including customer lists of the Sellers and their Affiliates (including all available back-up sales records, in both electronic and paper medium), any branded telephone or toll-free numbers, as well as all rights, title and interest of the Sellers and their Affiliates in, to and under the JLS Marks, any other names, trade names, goodwill, watermarks and copyrights and all licenses and sublicenses granted and obtained with respect thereto, and Intellectual Property Rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the laws of all jurisdictions;

(b)    All rights, title and interest in, to and under all design dies, engraving plates and storage cabinets for both design dies and customer dies (and all Intellectual Property Rights associated therewith) of the Sellers and their Affiliates, wherever located;

(c)    Custody and control of all customer dies, wherever located;

(d)    Any minute books and other corporate books and records of the Sellers relating to periods prior to the date acquired by the current Sellers and their respective owners;

(e)    All Inventory (including any "memo" inventory and inventory on consignment) of the Sellers and their Affiliates, including Inventory consisting of: (i) the raw paper and package inventory including liners, cardstock, etc.; and (ii) the finished goods (including goods in transit) consisting of cards, invitations, social stationery and envelopes, wherever located;

(f)    All Furniture and Equipment, including any non-leased computers (including any and all Mac computers), phones, file servers, etc., in each case, located at 699 Madison Avenue or elsewhere (including as the same existed on May 15, 2009), as well as all historical documentation and other display items (whether in storage or on display, including historical signage, its of the Sellers' provenance, etc.) at 699 Madison Avenue, or as located anywhere else, except to the extent excluded under **Schedule 2.2(i)**;

(g)    All Permits and similar rights of the Sellers used or held for use in the conduct of the business of the Sellers and the ownership and operation of the Acquired Assets;

(h)    All catalogues and reference material, including price lists, of the Sellers or their Affiliates, including all marketing, advertising and promotional materials;

(i)    All rights of the Sellers under the following Contracts (including all Improvements located on the Leased Property that is the subject thereof):

(1)     That certain Agreement of Lease for 699 Madison Avenue, 5th floor, New York, NY, as between David Gould Testamentary Trust, as lessor, and MJLS Inc., as lessee, dated September 1, 2002, as amended by Letter Agreement between David Gould Testamentary Trust, as lessor, and MJLS LLC, as lessee, dated May 15, 2007;

(2)     That certain Agreement of Lease dated July 1, 2006 by and between MJLS LLC, as lessee, and David Gould Testamentary Trust, as lessor, (including all amendments, extensions and other agreements related thereto) related to Leased Property at 699 Madison Avenue, 1st Floor, New York, New York; and

(3)     The License Agreement (except Excluded License Agreement Payments, which are Excluded Assets under **Schedule 2.2(j)**).

(j)     All rights of the Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of the Sellers or with third parties to the extent relating to the business of the Sellers or the Acquired Assets (or any portion thereof), to the extent assignable, and including all rights, benefits and claims under any agreements regarding confidentiality and restrictions on the conduct of third parties with respect to competition with the business of the Seller entered into in connection with the Bankruptcy;

(k)     All rights of the Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to the Sellers or to the extent affecting or relating to any Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets; and

(l)     all claims, causes of action, rights of recovery and rights of set-off of any kind relating to or arising out of the Acquired Assets, including any claims against insurance companies, except excluding any causes of action that are Excluded Assets under **Schedule 2.2(d)**.

## Schedule 2.2

## Excluded Assets

(a)    Any records, documents or other information relating to current or former employees of the Sellers;

(b)    Except as set forth in **Schedule 2.1(d)**, the minute books and other corporate books and records of the Sellers relating to their organization and existence and the Sellers' books and records relating to Taxes of the Sellers;

(c)    The amount of cash that the Sellers estimate in good faith to be necessary to pay all allowed fees, claims and liabilities under Section 503 of the Bankruptcy Code (including those fees, claims and liabilities incurred through the date of Closing (but not paid as of the Closing) and those fees and claims expected to be incurred after the Closing, including (i) in the event the Sellers pursue confirmation of a plan of reorganization or liquidation or the conversion of one or both of the Bankruptcy Cases and the liquidation of the Sellers, and (ii) the aggregate amount of any carve-out, which exists in any orders of the Bankruptcy Court regarding the Sellers' use of cash collateral, for the payment of professional fees and the fees of the U.S Trustee) (such fees and claims, "Administrative Expenses") other than Administrative Expenses incurred prior to the Closing that constitute trade payables; provided that the Sellers shall provide such good faith estimate of Administrative Expenses in writing to the Buyer prior to the Closing;

(d)    All preference or avoidance claims and actions of the Seller, including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code;

(e)    The Sellers' rights under this Agreement and the other Transaction Documents, and all cash and non-cash consideration payable or deliverable to the Sellers pursuant to the terms and provisions hereof;

(f)    Any Contracts other than the Assumed Contracts;

(g)    All claims and causes of action of the Sellers against Persons (other than the Buyer) (regardless of whether or not such claims and causes of action have been asserted by the Sellers), and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, of the Sellers (regardless of whether such rights are currently exercisable), in each case to the extent related to any Excluded Assets or Excluded Liabilities;

(h)    Accounts receivable, intercompany obligations and other amounts receivable of the Sellers owed to it by any other Sellers;

(i)    Any Furniture and Equipment financed by the Sellers under that certain Microsoft Loan and Security Agreement and Promissory Note between MJLS Inc. and De Lage Landen Financial Services, Inc. dated March 15, 2007; and

(j)    The Excluded License Agreement Payments.

# SELLERS DISCLOSURE SCHEDULES

These Disclosure Schedule is delivered pursuant to that certain Asset Purchase Agreement (the "Agreement"), dated as of September 3, 2009, by and among The 1929 Paper Company LLC (the "Buyer"), Mrs. John L. Strong & Co., LLC ("MJLS LLC") Mrs. John L. Strong & Co., Inc. ("MJLS Inc." and, together with MJLS LLC, the "Sellers" and each, individually, a "Seller").

Set forth below are certain schedules referenced in the Agreement, including certain exceptions to the representations and warranties of the Sellers made in Article V of the Agreement. Terms used herein but not otherwise defined shall have the meaning ascribed in the Agreement, except where the context otherwise requires. The disclosures and exceptions correspond to and are intended to modify the Seller's representations and warranties. The information contained herein is disclosed solely for the purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever, including any violation of law or breach of any agreement

**Schedule 2.5(a)**

**Cure Estimates for Assumed Contracts**

Annexed hereto is a Rent Statement, dated as of September 1, 2009, which the landlord, David Gould Testamentary Trust, alleges are the amounts due and owing under the existing leases for the North Store (1st Floor) and the 5th Floor of 699 Madison Avenue, New York, New York. Please note, however, that utilization of that rent statement cannot and shall not be construed as an admission or acknowledgement by MJLS LLC concerning the actual amounts due and owing under such Assumed Contracts, and MJLS LLC reserves the right to object to and challenge any and all amounts asserted in annexed Rent Statement. Notwithstanding the foregoing, MJLS LLC acknowledges the base rent owed for the period May 2009 through the present (but expressly excluding the amount of $24,000 asserted for an alleged refund of rent abatement, and the associated alleged late charge), as well as the late charges assessed for the unpaid base rent, and the real estate tax escalations, and corresponding late charges. Based on the foregoing, the Debtors anticipate having to make Cure Payments of no less than:

$129,297.78

KL2 2618722.3

**Schedule 2.5(c)**

**<u>Cure Estimates for Contracts that are not Assumed Contracts</u>**

- Lease Agreement between De Lage Landen Financial Services, Inc. and MJLS Inc., Reference Number TFV-23881

    Debtor's Cure Amount (as of August 28, 2009): $15,665.36


- Lease Agreement between Wells Fargo Financial Leasing and MJLS LLC, dated October 6, 2006.

    Debtor's Cure Amount (as of July 31, 2009): $1,205.20

KL2 2618722.3

**Schedule 5.1**

**<u>Organization</u>**

- None

**Schedule 5.2**

**<u>Authority; Execution and Delivery; Enforceability</u>**

- None

## Schedule 5.3(a)

## <u>No Conflicts; Consents</u>

- None

KL2 2618722.3

## Schedule 5.4

## **Permitted Encumbrances**

- See Schedules 5.5(d) and 5.7.

7

## Registered IP

### Trademark Registrations

The following is a complete list of Trademarks owned by MJLS Inc.:

- MRS JOHN L STRONG
  US Registration No. 3,264,492
  Registration Date: July 17, 2007

- MRS JOHN L STRONG NEW YORK & Design
  US Registration No. 3,264,493
  Registration Date: July 17, 2007

- READY TO WRITE
  US Registration No. 3,351,335
  Registration Date: December 11, 2007

- SEVEN DEADLY SINS
  US Registration No. 3,355,886
  Registration Date: December 18, 2007

- ENCYCLOPEDIC HOUSE SERIES
  US Registration No. 3,434,393
  Registration Date: May 27, 2008

- MRS JOHN L STRONG
  European Community Trademark Registration No. 005903505
  Registration Date: May 20, 2008

### Trademark Applications

The following is a complete list of trademarks subject to a pending application for registration by MJLS LLC or MJLS Inc.:

- PAPER PERFUME
  US Serial No. 77/248742

- MRS JOHN L STRONG & Design
  European Community Trademark Application No. 005903851

- READY TO WRITE
  European Community Trademark Application No. 006641971

### Domain Names

The following is a list of Internet domain names and sites registered to MJLS LLC and MJLS Inc.:

- [www.mrsstrong.com](www.mrsstrong.com)
- [www.mrsjohnlstrong.com](www.mrsjohnlstrong.com)
- [www.mrsjlstrong.com](www.mrsjlstrong.com)

KL2 2618722.3

## Schedule 5.5(d)

## IP Licenses

- License Agreement between MLJS Inc., as licensee, and MJLS LLC, as licensor, dated June 2, 2008, for use of the Registered IP, and any other intellectual property owned by MJLS Inc.

KL2 2618722.3

**Schedule 5.5(e)**

**Known Unauthorized Uses of Registered IP**

The following is a list of cease and desist letters sent MJLS LLC or MJLS Inc. over the past three years to third parties concerning uses of marks that such Seller believed were or could be confusingly similar to such Seller's trademarks:

- Cease and desist letters dated January 14, 2008 and February 7, 2008 to WriteRobinson regarding the unauthorized use of READY TO WRITE mark

- Cease and desist letters dated March 21, 2007, May 3, 2007 and May 30, 2007 to Frank Smythson of Bond Street, Inc. regarding the unauthorized use of READY TO WRITE mark

KL2 2618722.3

## Schedule 5.5(g)

### <u>Exclusive Information Users</u>

- None

KL2 2618722.3

## Schedules 5.5 (g) and (h)

## <u>Data and Website Data</u>

In or about May 2009, at the time that the Debtors were terminating all employees and shutting down substantially all of their operations, a laptop and a hard drive went missing and have not been recovered. Additionally, there was at least one rumor of a former employee, while still employed, utilizing a "thumb" drive for unknown purposes during that time period. The Debtors are unsure whether any Data and/or Website Data was on either the laptop or hard drive, or whether former employees actually misappropriated any Data and/or Website Data. The Debtors are in possession of several computer files obtained from the Debtors' servers that contain 10,000 + names and addresses used by the Debtors for marketing and sales purposes.

KL2 2618722.3

## Schedule 5.6(a)

## Leases

- That certain Agreement of Lease for 699 Madison Avenue, 5th floor, New York, NY, as between David Gould Testamentary Trust, as lessor, and MJLS Inc., as lessee, dated September 1, 2002, as amended by Letter Agreement between David Gould Testamentary Trust, as lessor, and MJLS LLC, as lessee, dated May 15, 2007.

- That certain Agreement of Lease dated July 1, 2006 by and between MJLS LLC, as lessee, and David Gould Testamentary Trust, as lessor, (including all amendments, extensions and other agreements related thereto) related to Leased Property at 699 Madison Avenue, 1st Floor, New York, New York.

- Lease Agreement between De Lage Landen Financial Services, Inc. and MJLS Inc., Reference Number TFV-23881.

- Lease Agreement between Wells Fargo Financial Leasing and MJLS LLC, dated October 6, 2006.

KL2 2618722.3

**Schedule 5.6(b)**

**<u>Leases – Cont.</u>**

- See Schedule 5.7

KL2 2618722.3

## Schedule 5.6(g)

## Furniture and Equipment

- See list attached as Annex A hereto.

KL2 2618722.3

**Schedule 5.7**

**Inventory**

- See list attached as Annex A hereto.

- Other than 699 Madison Avenue, New York, NY, Inventory is located at Pomco LLC, 4411-27 Whitaker Avenue, Philadelphia, PA and 75 Ninth Avenue, New York, New York 10011.  The Debtors only have custody and control of Inventory located at 699 Madison Avenue.

KL2 2618722.3

**Schedule 5.8**

**Legal Proceedings and Orders**

By motion dated August 18, 2009, and filed in the MJLS LLC Bankruptcy Case, David Gould Testamentary Trust, the landlord of MJLS LLC for its premises located at and known as the North Store (1st Floor) and 5th Floor of 699 Madison Avenue, New York, New York, is seeking an order of the Bankruptcy Court declaring that the Leases are not property of the bankruptcy estate of MJLS LLC, and related relief. MJLS LLC disputes the allegations in the Motion and will be filing an objection to that Motion with vigorous opposition. The outcome of that litigation is currently unknown, with a hearing scheduled for September 9, 2009, at 2:00 p.m. in the Bankruptcy Court.

KL2 2618722.3

**Schedule 5.9**

**Insurance Policies**

Business Owners Coverage (Personal Property Insurance):

Travelers - Policy No. I6806374C751-TCT09.  Effective Date:  6/1/2009 – 6/1/2010.  Policy fully paid.

Business and Management Indemnity Policy:

Illinois Union Insurance Company – Policy No. BMI20060911.  Effective Date:  11/12/2008 – 11/12/2009.  Policy fully paid.

KL2 2618722.3

## Schedule 5.10

## Seller Broker

The Sellers will be retaining the services of OEM Capital Corp., which retention and payment is subject to application to, and approval by, the Bankruptcy Court, to assist the Sellers in soliciting and negotiating higher or better offers for the Assets. Any fees, commissions, costs, or other charges will be solely the responsibility of the Sellers.

KL2 2618722.3

## Schedule 7.1

## Conduct of Business

The Debtors are <u>not</u> operating in the Ordinary Course of Business, and have no ability to do so for the foreseeable future. The only business that the Debtors currently transact is walk-in business for the sale of "ready to write" product located at 699 Madison Avenue, 5th Floor, New York, New York. The Debtors do not have set hours of operation. Because of the projected lack of revenue, the Debtors cannot commit to keeping the doors open and reserve the right to shut down all operations in its sole discretion in order to not accrue continued administrative expenses.

With regard to relationships with customers, the Debtors are aware of only one customer that is dissatisfied with the product delivered to her pre-petition. That customer has been seeking a refund. It was the policy of the Debtors to not offer refunds, but to offer credit or product. The Debtors offered product to that customer, which offer was declined. The Debtors have also been contacted by a small number of customers requesting that dies be returned. The Debtors have made best efforts to do so, but as they effectively have only two persons available to meet those requests, the Debtors cannot guaranty that such dies will be returned in as prompt a manner as requested by the customers. Such good faith inability to return requested dies may still result in a diminution of the Debtors' goodwill which is unavoidable given the financial extremis of the Debtors.

KL2 2618722.3

**Annex A**

**[See attached]**

KL2 2618722.3